**Danny T. GREENWAY, Plaintiff,**

v.

**The BUFFALO HILTON HOTEL, Defendant.**

No. 94–CV–878A(F).

United States District Court,
W.D. New York.

Jan. 21, 1997.

Law Offices of W. James Schwan (Tamara M. Giordano, of counsel), Buffalo, NY, Marcus, Knoer, Crawford & Hilton (David P. Marcus, of counsel), Buffalo, NY, for Plaintiff.

Littler, Mendelson, Fastiff, Tichy & Mathiason (Warren M. Davison, Samantha Rosenberg, of counsel), Baltimore, MD, for Defendant.

### DECISION and ORDER

FOSCHIO, United States Magistrate Judge.

#### *JURISDICTION*

The parties to this matter consented to proceed before the undersigned on December 29, 1995. The matter is presently before the court on Plaintiff's motion for pre-judgment interest, front pay, and attorney's fees

and costs, dated October 28, 1996; Defendant's motion to amend the judgment to reduce future and punitive damages, for judgment as a matter of law on backpay and compensatory damages, and for a new trial on punitive damages, dated November 4, 1996; Defendant's motion for judgment as a matter of law, or for a new trial on the issue of liability, dated November 4, 1996; and Defendant's motion to extend the stay of execution of judgment, or alternatively, to reduce the amount required for supersedeas bond, dated November 4, 1996.

## BACKGROUND

Plaintiff, Danny T. Greenway, filed a complaint against Defendant, Buffalo Hilton Hotel ("Buffalo Hilton"), on December 1, 1994, alleging that the Buffalo Hilton, Plaintiff's former employer, had discriminatorily discharged him, based on his disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York Human Rights Law, Executive Law § 297. Plaintiff, who had been employed as a bartender at the Buffalo Hilton, was terminated approximately eighteen months after Defendant learned that Plaintiff had tested positive for the HIV virus. Defendant denied that Plaintiff's disability was the reason for Plaintiff's termination, contending that Plaintiff was terminated pursuant to Defendant's progressive disciplinary policy after four unsatisfactory work incidents involving Plaintiff.[1]

Jury selection began on October 8, 1996, with testimony commencing on October 10, 1996. At the close of Plaintiff's evidence, and again at the close of Defendant's case, Defendant moved for a directed verdict on the issue of liability, which were denied by the court. Following the conclusion of the trial, the jury found for the Plaintiff, and awarded $65,000 in backpay, $50,000 for future health insurance premiums, $324,000 for future medication costs, and $1,000,000 in punitive damages, for a total award of $1,439,000.

Thereafter, on October 28, 1996, Plaintiff filed a motion for pre-judgment interest,

front pay, and attorneys' fees and costs. On November 4, 1996, Defendant filed a motion to amend the judgment, pursuant to Fed. R.Civ.P. 59(e), for a judgment as a matter of law on backpay and compensatory damages, pursuant to Fed.R.Civ.P. 50(b), and for a new trial on punitive damages, pursuant to Fed. R.Civ.P. 59(a), a motion for judgment as a matter of law, or for a new trial, on the issue of liability, and a motion to extend the stay of execution of the judgment, or to reduce the amount required for the supersedeas bond, along with supporting memoranda. Defendant also requested oral argument on the motions.

On November 22, 1996, Defendant filed a memorandum in opposition to Plaintiff's motion. On the same day, Plaintiff filed a memorandum in opposition to Defendant's motions. Thereafter, on December 4, 1996, Plaintiff and Defendant both filed reply memoranda. Oral argument on the motions was held before the undersigned on December 18, 1996.

For the reasons as set forth below, Plaintiff's motions are GRANTED, in part and DENIED, in part. Defendant's motions are GRANTED, in part and DENIED, in part.

## FACTS

Plaintiff, Danny T. Greenway, commenced his employment with Defendant, the Buffalo Hilton Hotel, on December 12, 1987, working as a bartender at Charlie's Saloon, a bar within the Buffalo Hilton. Greenway worked at the Buffalo Hilton from December, 1987 until July, 1992 without incident. During that time, Greenway's immediate supervisor was Jerry Kulwicki. Kulwicki, in turn, reported to Richard Seidler, the food and beverage manager. Greenway himself did not have much contact with Seidler.

Greenway was diagnosed as carrying the HIV virus in 1987, prior to the commencement of his employment with the Buffalo Hilton. Greenway did not inform anyone at the Buffalo Hilton of his HIV positive status at the time of his hire.

---

1. Defendant does not dispute that Plaintiff's HIV-positive condition constitutes a disability under the ADA.

Greenway received employee evaluations from Kulwicki on a semi-annual basis throughout his employment with the Buffalo Hilton. Throughout the five year period from December, 1987 through July, 1992, Greenway received consistently favorable evaluations.

In July, 1992, Greenway took a one month disability leave because of fatigue and stress. In order to obtain disability benefits under the Buffalo Hilton's disability insurance program, Greenway was required to complete a proof of claim form. Greenway completed the form, which included a physician's statement, and gave the form to Kulwicki on July 21, 1992. The information on the form provided by Greenway's physician, Dr. Neal Rzepkowski, revealed that Greenway was HIV positive. Upon giving the form to Kulwicki, Kulwicki looked at the form and then told Greenway that he was required to give the form to Richard Kotas, the personnel manager for the Buffalo Hilton. Greenway then went to see Kotas and provided him with the disability form. Greenway discussed the contents of the form with Kotas, and requested that Kotas keep Greenway's HIV positive status confidential. The general manager, Rudy Rainer, however, was told of Greenway's HIV positive condition by Kotas, and Rainer informed Seidler.

Greenway returned to work on August 17, 1992. In September, 1992, Greenway received his semi-annual employee evaluation. For the first time, Greenway received a below average evaluation from Kulwicki. In fact, Greenway's evaluation went from the second highest ranking in April, 1992 to the second lowest ranking in September, 1992.

On September 20, 1992, Greenway was told that certain V.I.P.s, a group of travel agents evaluating the hotel, were going to be in Charlie's Saloon that evening. A waitress was added to the staff, and the evening proceeded without incident. The guests came into Charlie's Saloon at approximately 10:30 p.m., and by 2:00 a.m., only five or six guests were left. As the remaining guests had indicated that they did not want any further drinks, Greenway decided to close the bar. However, on October 5, 1992, Greenway received an employee discipline from Kulwicki,

dated September 29, 1992. Kulwicki told Greenway that someone had complained to Seidler that Greenway had closed the bar too early on September 20, 1992, and Seidler told Kulwicki to write up Greenway. According to Greenway, normal hotel policy was that, in the bartender's discretion, the bartender was to close the bar if business was slow. While Greenway had closed the bar early many times before, he had never been disciplined for taking such action. Kulwicki was unable to recall the actual identity of the patron who allegedly made the complaint, relying upon Seidler's direction.

On October 30, 1992, Greenway received a second employee discipline from Kulwicki. According to Greenway, Kulwicki informed him that a comment card had been received from a hotel guest indicating that Greenway had been rude to the guest, and that Seidler wanted Greenway written up for the incident.

On January 13, 1993, Greenway received another employee discipline for allegedly being insubordinate. According to the employee discipline, Greenway had called the engineering department at the Buffalo Hilton because the employee bathroom was very cold, instead of simply submitting a work order which would have prompted the engineering staff to attend to the complaint. Greenway spoke to John Davies, the chief engineer, who told Greenway to submit a work order. Words were exchanged, and Davies hung up the telephone. At the end of Greenway's shift, he completed a work order to have the bathroom checked. Greenway then encountered Davies on his way to drop off the work ticket, and Davies told Greenway that he was supposed to go through the proper channels by completing a work ticket, and that he should not call the engineering department. At the conversation's end, Greenway gave Davies the work ticket and left. Davies immediately complained to Seidler about Greenway's attitude, and Seidler told Kulwicki to give Greenway an employee discipline. Based on that misconduct report, the third disciplinary action, Greenway was suspended from work for five days.

On January 22, 1994, Charlie's Saloon was filled to capacity because of the presence of guests staying at the hotel who were partici-

pating in or attending a National Football League playoff game to be held the next day, Sunday, in Buffalo. Kulwicki was unavailable, so Greenway claimed he tried to ask Seidler, who was briefly present in the bar, to obtain more help to serve the customers. Seidler, however, did not offer any assistance, although he testified that Greenway did not request any help. The waitress who was working at the time, Tamara Nunn, asked to come behind the bar to make drinks, but Greenway declined because she was not a seasoned bartender, and he felt she was not competent to make drinks. Greenway was scheduled to work until 6:30 p.m. that evening, however, he stayed until 7:45 p.m. because of the crowd.[2] When Greenway left, he believed that the situation in Charlie's Saloon was in control.

On February 3, 1994, Greenway received an employee discipline on the basis that, on January 22, 1994, he failed to obtain help in the bar during the very busy period, that he failed to notify the manager on duty of the situation, and that he failed to cooperate with the hotel restaurant staff when they tried to help him. Greenway was asked to come to the personnel office after his shift. Upon arrival at Richard Kotas' office, Greenway found Kulwicki, Kotas, and Seidler waiting for him. Greenway was given the employee discipline form, and informed that he was being terminated pursuant to hotel policy which provided that any employee who received more than three disciplines would be terminated. Kotas told Greenway that he was still eligible for his health benefits. Greenway continued his benefits for three months, and then stopped paying the premiums to the Buffalo Hilton whereupon his health insurance coverage ceased.

After his termination, Greenway worked for a temporary agency for six months, from May, 1994 through October, 1994. Despite his fourteen years experience as a bartender, Greenway did not apply for any other bar-

tending positions because of his experience with the Buffalo Hilton. Greenway went into a retraining program to obtain skills as a machinist. Upon completion of the program, on January 12, 1996, Greenway was unable to find work in that occupation. As of the time of trial, Greenway remained unemployed.

## DISCUSSION

### 1. Judgment as a Matter of Law/New Trial on the Issue of Liability

Defendant Buffalo Hilton first moves the court to grant it judgment as a matter of law, or, in the alternative, to grant it a new trial on the issue of liability on the following grounds: (1) Plaintiff offered no direct evidence to support a finding that he was discharged because of his disability; (2) the circumstantial evidence presented at trial was insufficient to enable a reasonable juror to find that Plaintiff had been discharged because of his disability rather than because of the Buffalo Hilton's disciplinary policy; and (3) the jury was influenced by Plaintiff's counsel's prejudicial comments to the jury during his closing argument.

The party filing a motion for judgment as a matter of law bears a heavy burden. *Concerned Area Residents for Environment v. Southview Farm,* 34 F.3d 114, 117 (2d Cir. 1994). In ruling on such a motion, the court must "consider the evidence in the light most favorable to the [non-moving] party and ... give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence." *Concerned Area Residents for the Environment, supra,* at 117 (quoting *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 367 (2d Cir. 1988)). To grant a judgment as a matter of law, the court must find that there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant

---

**2.** At trial, another bartender, John Kotsis, insisted that Greenway left the bar at 6:30 p.m. even though help was needed. Greenway, however, testified that he remained at the bar past his shift ending time until 7:45 p.m. Nonetheless, on cross-examination, Kotsis conceded that Greenway stayed after Kotsis arrived for at least five minutes while Greenway completed paperwork and washed glasses. Kotsis also testified that, based on his observation, he could see that the situation in the bar would have been in control within fifteen minutes, and that he did not ask Greenway to stay and assist him.

that reasonable and fair-minded men could not arrive at a verdict against [it]." *Concerned Area Residents for the Environment, supra,* at 117 (quoting *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992)). Further, it is well established that a motion for a directed verdict at the close of the evidence is a prerequisite for a judgment as a matter of law. *Hilord Chemical Corp. v. Ricoh Electronics, Inc.,* 875 F.2d 32, 37 (2d Cir.1989). A judgment as a matter of law is limited to those issues "specifically raised in [a] prior motion for a directed verdict." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993).

■ In the alternative, Defendant seeks a new trial pursuant to Fed.R.Civ.P. 59(a) on the same grounds. A trial court should grant a motion for a new trial when it is convinced that the jury has reached a seriously erroneous result, or that the verdict is a miscarriage of justice. *Piesco v. Koch,* 12 F.3d 332, 345 (2d Cir.1993); *Hygh v. Jacobs,* 961 F.2d 359, 365 (2d Cir.1992). A trial judge's disagreement with the jury's verdict is not alone a sufficient reason to grant a motion for a new trial. *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 691 (2d Cir.1983).

Defendant argues that Plaintiff's conclusory allegations that Defendant terminated him because of his HIV positive status were wholly insufficient to support any federal or state claim of discrimination, and that Plaintiff did not produce any evidence to establish that he was discharged because of a disability. Further, Defendant contends that Plaintiff's counsel's interjection, during summation, of the subject of homosexuality was fatal to Plaintiff's claim of liability, because the jury could then have believed that Plaintiff was discharged because of his sexual orientation, not because of his disability, and that such discrimination, although improper, is not violative of either federal or state law. Plaintiff asserts that sufficient evidence was introduced that he was discharged because of his disability, and that, additionally, he never claimed that he was terminated because of his sexual orientation, nor did he ever contend that Defendant was displeased with the fact that he could have been gay.[3]

■ Under the ADA, and the New York State Human Rights Law, it is unlawful for an employer to discharge an employee because of that employee's disability. As it was not disputed by the parties that Plaintiff's HIV positive condition was a disability protected under these laws, in order to establish a prima facie case of discrimination, Plaintiff was only required to show that he was terminated under circumstances inferring that his discharge was because of his HIV positive status. The jury found that Plaintiff was discriminated against and was terminated because of his disability, and the jury further found that Defendant did not establish any legitimate, non-discriminatory reasons for its actions.

The evidence presented at trial showed that, as alleged by Defendant, Plaintiff was terminated from his position following a fourth disciplinary incident pursuant to Defendant's employment policy which mandated termination of an employee after three disciplinary warnings. It was not disputed that Plaintiff was fully apprised of the disciplinary policy. However, there was also evidence that Plaintiff, who was employed by the Buffalo Hilton from December, 1987 until February, 1994, never received a disciplinary warning during his first five years of employment, but only began to receive disciplinary warnings after it was revealed to Defendant's senior management that Plaintiff was HIV positive. There was also evidence that Plaintiff received favorable employee evaluations until Defendant learned that Plaintiff was HIV positive, at which time his evaluation ratings given by Kulwicki slipped markedly. There was, moreover, evidence that other employees were not disciplined for violations of Defendant's work rules while Plaintiff was always disciplined once his HIV positive status became known. Plaintiff also established that, according to the Buffalo Hilton Employee Handbook, some of these violations by other employees required termination after a fourth incident, but in the cases presented, no such termination occurred. Defendant introduced documentary evidence of Greenway's employee disciplines in an attempt to

---

**3.** There was no evidence presented to the jury regarding Plaintiff's sexual orientation.

articulate a legitimate business reason for its actions, but it could not articulate any legitimate business reason for Kotas divulging Greenway's HIV positive condition to the general manager, Rainer, or Rainer's subsequent disclosure of it to Seidler. It was only after these senior management personnel became aware of Greenway's condition that Greenway's job performance was for the first time, in the form of written warnings, found to be substandard.

In order to obtain a judgment as a matter of law, a moving party must demonstrate that the existence of the overwhelming amount of evidence in favor of the movant is such that a reasonable jury could not arrive at a verdict against it. A judgment as a matter of law is only appropriate when there is "such a complete absence of evidence supporting the verdict that the jury finding could only have been the result of sheer surmise and conjecture." *King v. Macri,* 800 F.Supp. 1157, 1160 (S.D.N.Y.1992). On this record, the court finds that Defendant cannot meet this burden. Here, the jury's determination rested on its assessment of Plaintiff's testimony as opposed to the testimony of Defendant's employees. Defendant's witnesses portrayed a vastly different story than did Plaintiff. According to Defendant's witnesses, Greenway had employment difficulties prior to July, 1992 which were not documented, while Greenway testified that he had no difficulties prior to the time that his HIV positive status was revealed. Given the direct clash of testimony on numerous critical factual issues in this case, it was the jury's responsibility to make a determination as to which witnesses it chose to believe, as it is proper to leave any issues of credibility and fact-finding within the province of the jury. *Piesco v. Koch,* 12 F.3d 332, 345 (2d Cir.1993). It is evident that the jury chose to believe Greenway's version of the facts, finding a substantial portion, if not all, of Defendant's evidence not credible. As such, the court cannot grant Defendant a judgment as a matter of law on the threshold question of Defendant's liability based on Defendant's contention that Plaintiff failed to introduce sufficient evidence to support his claim.

Defendant also asserts that the jury failed to follow the court's instructions, and, according to Defendant, "apparently misunderstood the court's instruction," as it summarily rejected Defendant's defense, finding that Defendant had not presented evidence of a legitimate, non-discriminatory reason for Plaintiff's discharge. Defendant's Memorandum of Law in Support of Motion for Judgment as a Matter of Law, dated November 4, 1996, at p. 8. Defendant maintains that the jury committed plain error when it found that Defendant did not articulate any legitimate non-discriminatory business reasons for Greenway's termination, as, by simply presenting the documented evidence of Plaintiff's alleged poor performance, Defendant established its non-discriminatory reasons for Plaintiff's discharge sufficient to meet its burden of production.

In the jury questionnaire, the jury was asked as follows:

**Question 1.** Do you find that the Defendant, Buffalo Hilton Hotel, terminated Plaintiff, Danny T. Greenway, under circumstances giving rise to an inference of discrimination against him because of his disability, namely, Mr. Greenway's HIV positive status?

The jury answered "YES."

**Question 2.** Did the Buffalo Hilton Hotel present evidence that there were legitimate, non-discriminatory reasons for terminating Mr. Greenway from his position as a bartender?

The jury answered "NO."

The jury did not reach the third question posed by the questionnaire which asked whether the legitimate reasons set forth by the Buffalo Hilton Hotel were mere pretext for what was in truth a discriminatory termination, having been instructed that if the answer to Question 2 was "NO" they should proceed to Question 4 which discussed damages. Defendant surmises that, therefore, the jury misunderstood the instructions because the fact that Defendant put on the defense that it did, in Defendant's view, required the jury to answer "YES" to Question 2 of the jury questionnaire.

Juries, however, are presumed to follow the court's instructions. *Greer v. Miller*, 483 U.S. 756, 765 n. 7, 107 S.Ct. 3102, 3109 n. 7, 97 L.Ed.2d 618 (1987). In this case, the court, without objection, gave the jury a copy of the court's instructions to take into the jury deliberation room for their reference.[4] Defendant does not complain that the jury was improperly charged on the Plaintiff's ultimate burden of persuasion as to whether Defendant fired Greenway because of his disability. The fact that the jury ultimately discredited and rejected Defendant's defense does not lead to the conclusion that the jury must have disregarded the court's instructions. Indeed, the court's instructions fully discussed the burden on the Defendant to present a legitimate business reason for its actions against Greenway and Plaintiff's ultimate burden of proving he was discharged because of his disability. However, the law does not state that any time a defendant gives a reason for its actions that the jury must find that the reason was legitimate and non-discriminatory, and that liability can then only be premised on a finding that the reason given was a mere pretext. Such a statement would render the Defendant's burden of production practically non-existent. Rather, the employer in a discrimination case must articulate a legitimate, non-discriminatory reason, which is specific and clear enough for the employee to address, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981), and legally sufficient to justify a judgment for the employer. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094–95. "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decisions had not been motivated by discriminatory animus." *Burdine*, at 257, 101 S.Ct. at 1096. The jury, after considering the quantity of Defendant's evidence, obviously found that Defendant's reasons were not legitimate, finding that Defendant's discipline of Greenway was not legitimate where other employees were not disciplined similarly for equally or more serious work rule violations. The jury was therefore entitled to find for the Plaintiff on the issue of whether Plaintiff was discharged because of his disability.

Other than a conclusory argument, Defendant has submitted no specific evidence to support its contention that the jury did not follow the court's instructions on whether Plaintiff had proven that he was discharged because of discrimination. Nor has Defendant pointed to any authority for its postulation that the jury must necessarily find that the defendant has articulated legitimate reasons for its actions if the defendant puts on any defense. Thus, this argument is insufficient to warrant either a judgment as a matter of law or a new trial.

Defendant was required to articulate a reason for Greenway's discharge "which, *if believed by the trier of fact*, would [have] support[ed] a finding that unlawful discrimination was not the cause" of the discharge. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (citing *Burdine, supra*, at 254–55, 101 S.Ct. at 1094–95) (emphasis in original). The jury's award to Plaintiff based upon its assessment of the truthfulness of Defendant's witnesses and the Defendant's evidence of its proffered non-discriminatory reasons is entirely consistent with the holding in *St. Mary's, supra* that establishing Defendant's reasons as not legitimate in itself does not compel a judgment for Plaintiff. *St. Mary's* makes clear that the trier of fact must nevertheless find a plaintiff has satisfied its ultimate burden of proving discrimination as a fact. *St. Mary's Honor Center, supra*, at 511, 113 S.Ct. at 2749. However, as the Court explained:

"The fact finder's disbelief of the reasons put forward by defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of [plaintiff's] *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional

---

4. The instructions included the admonition that the jury should refer to the entire instruction, and not only to one part of the instruction. Trial Transcript, dated October 18, 1996, at p. 68.

**1052**

discrimination ... and, upon such rejection, no additional proof of discrimination is required."

*St. Mary's Honor Center, supra,* at 511, 113 S.Ct. at 2749.

The question here therefore is whether the jury had a basis upon which to reject Defendant's proffer of legitimate reasons the four disciplinary actions—which together with its finding that Greenway had established a *prima facie* case of discriminatory discharge—satisfied the requirement that the jury must make "a finding of discrimination." *St. Mary's Honor Center, supra,* at 512 n. 4, 113 S.Ct. at 2750 n. 4.

In this case, through a painstakingly detailed examination of Mr. Kulwicki, Greenway's supervisor, who was qualified as a hostile witness, and through his examination of Defendant's other witnesses, Greenway succeeded in giving the jury ample reason to find that Defendant's articulated reasons for discharge were, in numerous material respects, untrue, and therefore not legitimate. Further, Greenway was also able to satisfy the jury that, taken together with the coincidental and dramatic decline in Greenway's performance ratings, the Defendant's failure to discipline other employees with similar or more serious work rule violations were, under its claimed neutral 'four disciplines and you're out' policy, provided ample reasons for the verdict in Greenway's favor.

For example, Greenway was disciplined for closing the bar on September 20, 1992 too early resulting in a report of customer dissatisfaction. Kulwicki insisted that although he was not present at the time, he later investigated and "the more I [Kulwicki] found out about it, it was a big thing." Trial Transcript, dated October 11, 1996, at p. 201. The discipline charged that Greenway failed to keep the bar open after the usual normal closing time of 1:00 a.m., although Greenway testified he stayed open until approximately 1:30–1:45 a.m. and closed the bar because the group from which the complaint emanated "were no longer drinking," "just sitting," when he gave the "last call" with no response. Trial Transcript, dated October 10, 1996, at p. 109. Greenway's recollection was corroborated by Ms. Linda Langan, who was

Defendant's night audit manager. Trial Transcript, dated October 15, 1996, at p. 173. Langan, who served as night manager on September 20, 1992, recalled that the VIP group was in Charlie's that night, and that she was asked to "Z-out," or close the bar's cash register, at 3:20 a.m., a task that was typically completed after a bartender had served the last check, and cleaned the bar, October 15, 1996 Transcript, at pp. 176, 181, and that she did recall telling an EEOC investigator that Greenway did not close the bar before 1:00 a.m. October 15, 1996 Transcript, at p. 177. Langan also testified that typically the bartender would call her to "zero-out" about fifteen to twenty minutes before she would actually arrive to perform this audit task. October 15, 1996 Transcript, at p. 181. Langan also testified that, as the manager on duty that evening, she received no customer complaints about the bar closing too early. *Id.*

In attempting to justify the discipline given to Greenway as a result of a patron complaint in October, 1992, Kulwicki stated he believed the unidentified patron's complaint because Greenway *"always* had problems with customers," Trial Transcript, dated October 15, 1996, at p. 16 (emphasis added), yet when asked if it was not true that prior to July, 1992, when Greenway took a one-month disability leave based on the disability form which Greenway presented to Kulwicki, Kulwicki had never "even indicated [in Greenway's performance evaluations] that Danny Greenway ever had problems with patrons," Kulwicki conceded he had not, stating "This is true." October 15, 1996 Transcript, at p. 18. As to the fourth discipline which was based on Greenway's failure to request assistance to handle the large crowd of customers at Charlies on January 22, 1994, Kulwicki, who did not observe the conditions because he was not at the hotel at the time, also conceded that the report of the manager on duty for that evening failed to indicate that, other than the bar being extremely crowded during Greenway's shift, there were any "problems with any guests at Charlie's Bar." October 15, 1996 Transcript, at pp. 66–67.

The jury therefore had before it a record upon which it could fairly determine that the Defendant's asserted neutral means for discharge were not only untrue but also, commencing as they did shortly after Greenway's return from disability and the acquisition by senior managers of the nature of Greenway's disability, taken together with the fact that other employees were not so severely disciplined on more significant or comparable work rule violations, that Greenway had sustained his ultimate burden of proof of discrimination.

While Defendant now objects to the phraseology of the jury questionnaire, it is important to note that Defendant made no objection to either the instructions, which clearly cast Plaintiff with the proper burden[5] or to the questionnaire until after the verdict was rendered. On this record, Defendant was not found liable based only on a finding that the Defendant's proffered reasons for discharge were false and therefore not legitimate. Rather, the jury found that such reasons, which it believed to be false, combined with Plaintiff's other evidence, constituted a preponderance of circumstantial evidence from which the jury could, and did, find discrimination based on Greenway's disability. There is therefore no basis to grant a new trial on Defendant's belated contention.

■ Finally, Defendant argues that, by interjecting the subject of homosexuality into the trial during his attorney's closing summation, Plaintiff prejudiced the jury, and that, as such, Defendant is entitled to a judgment as a matter of law or a new trial on the issue of liability, or, at a minimum, a judgment as a matter of law or new trial on the issue of punitive damages. Defendant contends that Plaintiff's attorney changed the focus of the jury from that of an alleged wrongful termi-

nation on account of a disability, to that of an alleged wrongful termination on account of Plaintiff's homosexuality, providing the jury with a reason "to react emotionally to the alleged hate and intolerance shown by the Defendant." Defendant's Memorandum of Law, dated November 4, 1996, at p. 12.

■ First, the court notes that Defendant did not object to Plaintiff's closing argument at the time of trial. At oral argument on these post-trial motions, Defendant's counsel conceded that he did not object during the summation as he did not wish to bring further attention to Plaintiff's counsel's allegedly inflammatory remarks. However, neither did defense counsel object after the jury left the courtroom which would have enabled the court to further instruct the jury about the issue. Plaintiff maintains that Defendant has therefore now waived any right to make an objection to his summation. The court agrees. "Neither trial tactics nor mere temerity will excuse counsel's failure to object to a remark made in closing argument." *Carmel v. Clapp & Eisenberg, P.C.*, 960 F.2d 698, 704 (7th Cir.1992). Any potentially improper statements should be called to the attention of the trial judge so that the judge may be given a timely opportunity to correct any prejudice that might result from such remarks. *Doe v. Johnson*, 52 F.3d 1448, 1465 (7th Cir.1995). Defendant never raised the issue that Plaintiff's counsel made alleged improper remarks during his summation until Defendant filed its post-trial motions. As such, the court finds that Defendant has waived his right to object to such statements. *See Nissho–Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619–20 (5th Cir.1988) (plaintiff waived any objection to improper closing argument made by defense counsel when plaintiff failed to object to such tactics at time of argument, or at a sidebar conference immediately thereafter).

---

5. The jury was instructed in the charge that it should remember throughout the case that, as a general matter, the Plaintiff bears the burden of proof by a preponderance of the evidence that the Defendant discriminated against him on the basis of his disability. Trial Transcript, dated October 18, 1996, at p. 81. Later on, the jury was instructed that "if you find that Plaintiff has established by a preponderance of the evidence

the disputed fact which I have just discussed and that the Defendant has not articulated a legitimate reason for its actions on Plaintiff's claim, then you must find for Mr. Greenway." Trial Transcript, dated October 18, 1996, at pp. 84–85. As discussed, the jury followed these instructions, and answered the questionnaire in accordance with the instructions, ultimately finding for Plaintiff.

Secondly, even if Defendant did not waive his right to object to Plaintiff's summation, Defendant's argument must fail. The evidence presented at trial focused on Plaintiff's claim that he was discharged because of his disability, *i.e.*, his HIV positive status. There was simply no allegation or evidence that Plaintiff believed that he was terminated from employment because of his sexual orientation. Indeed, there was no mention of whether or not Plaintiff was a homosexual at any time during the trial, including both summations. Therefore, the jury had no proof before it, and could not have found, that Plaintiff was discharged because he was homosexual. The only time homosexuality was mentioned was during Plaintiff's closing argument.

Plaintiff contends that homosexuality was only mentioned by his attorney as an example of discrimination that needs no motive for its existence, in response to defense counsel's suggestion during his closing argument that Defendant had no motive for discriminating against Plaintiff. In his closing argument, Plaintiff's counsel said:

Mr. Davison [defense counsel] raised this issue of motive. Why would they fire him, there's no motive. Now he acknowledges that we don't have to show motive. Nor do you have to show motive, I don't believe, in a criminal case either. Well they don't have to show motive, but they haven't shown any. Why would they fire him. What possible motive would there be in this case? They said well, maybe they thought he was a danger to others and we weren't concerned. We stipulate that he was not danger to others, that wasn't, that's not the motive in this case. What motive is there ever for discrimination and prejudice and bigotry? What motive is there ever, why are people out there on the streets and you hear about gay bashing. Why does someone take a baseball bat and whack somebody with it because he thinks somebody is a homosexual. Why is it that maybe 75 years ago you wouldn't see women in the courtroom practicing as lawyers or practicing as doctors. Why is it that this country has a history sometimes of not treating people equally and fairly and looking at people like they're different.

What motive is there ever for prejudice and bigotry? There is no motive for it. It stems from hate, from ignorance, maybe from fear. There is no motive involved here when someone looks at Danny Greenway and sees some kind of monster. They don't have a motivation for that. It's what they feel, its what they believe inside of them.

Trial Transcript, October 18, 1996, at pp. 64–65.

Plaintiff's counsel then went on to state:

We're not going to stand for people treating the Danny Greenways of this world in the way he was treated. We are not going to accept what the Hilton Hotel did to Danny Greenway. Your decision, either way, will send a message, not just to this man here, not just in this courtroom, but will send a message everywhere that we must stop all the Seidlers out there, all the Seidlers that would choose to look at this man differently, merely because he has a disability.

Trial Transcript, October 18, 1996, at pp. 65–66.

In ruling on a motion for a judgment as a matter of law, or for a new trial based on attorney misconduct, the trial court must determine whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury. *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770, 780 (S.D.N.Y.1984), *aff'd on other grounds*, 768 F.2d 22 (2d Cir.), *cert. denied*, 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985). The court finds that the mention of homosexuality and "gay bashing" in the context of a summation addressing the issue of prejudice and bigotry as a "motive" for discrimination, was, at most, strong counter-argument against Defendant's "no motive" defense which, taken in the context of Plaintiff's entire summation, was not prejudicial. The fact that the jury heard "isolated comments" in the context of an otherwise proper summation does not warrant a new trial, especially where the jury had the benefit of the court's instructions which reminded

the jury that statements of counsel do not constitute evidence. *Anastasio v. Schering Corp.*, 838 F.2d 701, 706 (3d Cir.1988). Despite Defendant's statement that Plaintiff's closing argument sought to change the reason for Plaintiff's discharge to Plaintiff's homosexuality, a careful reading of the disputed portions of Plaintiff's summation shows there was no such reference made.[6] Even assuming that the jury understood Plaintiff's counsel's rhetorical illustration as referring to Plaintiff's possible sexual orientation, when considered in light of the court's clear and repeated instruction that statements by the attorneys are not evidence and that the case must be decided only upon the evidence, such comments provide no reason for a new trial.

Further, the court finds, for the same reasons, no basis upon which to grant a judgment as a matter of law or a new trial on the issue of punitive damages based on the same remarks. The remarks made simply did not so exceed the bounds of propriety such that a new trial on these issues is mandated. *Mileski v. Long Island Rail-Road Company*, 499 F.2d 1169, 1174 (2d Cir.1974).

### 2. *Motion to Amend the Judgment to Reduce Damages*

At the conclusion of this case, the jury awarded Plaintiff $1,000,000 in punitive damages. Defendant asserts that this award must be reduced to $200,000 to conform with the ADA and with the New York Human Rights Law. Plaintiff does not dispute that the punitive damages must be reduced in accordance with the limits set by the ADA, but argues that the award should be limited to $300,000.

While an award of punitive damages is not permitted under the New York Human Rights Law, *Thoreson v. Penthouse Interna-tional*, 80 N.Y.2d 490, 591 N.Y.S.2d 978, 606 N.E.2d 1369 (1992), the award of compensatory and punitive damages in cases of intentional discrimination in employment, including discrimination on account of a disability, are permitted under 42 U.S.C. § 1981a. The sum of the amount of compensatory and punitive damages is limited under the statute as follows:

> ... in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, [compensatory and punitive damages are limited to] $200,000.

42 U.S.C. § 1981a(b)(3)(C).

In the instant case, testimony at trial revealed that Defendant, the Buffalo Hilton, had a work force that did not exceed 320 employees during the relevant time period. Accordingly, under the ADA, the sum of compensatory and punitive damages to be awarded to Plaintiff should, according to Defendant, be limited to $200,000.

Plaintiff argues, however, that the owner of the Buffalo Hilton, Clement Chen, Jr., also owns or has an interest in a Holiday Inn in Laguna Hills, California, and holds an interest in a hotel in Beijing, China. Plaintiff contends therefore, that the aggregate of the employee work force in these hotels is over 501 employees, and, under the federal statute, the damage limit is thus raised to $300,-000.[7] Second, Plaintiff contends that, as the Buffalo Hilton has a franchise relationship with the Hilton Corporation, there is a basis for treating the Hilton Corporation and the Buffalo Hilton as an integrated enterprise for the purpose of meeting the 501 employee floor of 42 U.S.C. § 1981a(b)(3)(D).

In order for two facially separate entities to be treated as a single employer for purposes of the ADA's damage limits, the

---

**6.** Indeed, a reading of the record reveals that defense counsel may have attempted to infer Plaintiff's sexual orientation during his own summation which preceded Plaintiff's counsel's summation to the jury. *See* Trial Transcript, dated October 18, 1996, at p. 27 (defense counsel stated, "I am specifically going to ask you not in any way to judge him [Plaintiff] in his lifestyle or his manner in which he got his disease").

**7.** In the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, [the sum of compensatory and punitive damages is limited to] $300,000. 42 U.S.C. § 1981a(b)(3)(D).

entities must be so integrally related that they are, in actuality, one single entity. *Doe v. William Shapiro, Esq., P.C.*, 852 F.Supp. 1246, 1249 (E.D.Pa.1994). Single employer status ultimately depends on all of the circumstances of the case, and is characterized as an absence of an "arms length relationship found among unintegrated companies." *National Labor Relations Board v. Big Bear Supermarkets # 3*, 640 F.2d 924, 928 (9th Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980). In making a determination of single employer status, courts have considered four factors: (1) the interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control existing among the several entities. *Jones v. Inter–County Imaging Centers*, 889 F.Supp. 741, 745 n. 4 (S.D.N.Y.1995).

In this case, there is some evidence of common ownership of the Buffalo Hilton, the Laguna Hills Holiday Inn, and the Beijing hotel. However, the court does not find any evidence in the record to support a finding that the three hotel operations are interrelated in any way, such as through common management, or other centralized control. The fact that Richard Seidler was offered a promotion from his position at the Buffalo Hilton to that of general manager of the Laguna Hills Holiday Inn does not establish, contrary to Plaintiff's assertion, any integration of operations. At most, it shows that Clement Chen, the owner, found Seidler to be a valuable employee and offered him a position of advancement in another of his hotels. There is no evidence that once Seidler left the Buffalo Hilton he was in any way involved with its operations from his position with the Laguna Hills Holiday Inn. There is also no evidence in the record relating to Chen's centralized control of these hotels, such as whether Chen holds a financial interest only, or whether he is involved in day-to-day operations sufficient to find centralized management of the hotels. Finally, there is no evidence of any common management, or common departments, such as personnel, labor relations, financial operations. Rather, based on the trial record, the court finds that the three hotels operate as separate organizations. The court finds, therefore, after considering the four factors as outlined, that as the three hotels owned by Chen are not integrated companies, their work forces cannot be aggregated to meet the 501 employee threshold necessary to apply the $300,000 limit on compensatory and punitive damages.

Plaintiff's franchise operation argument also must fail. In *Burdi v. Uniglobe Cihak Travel, Inc.*, 932 F.Supp. 1044, 1048 (N.D.Ill.1996), the court found a travel agency franchisor and franchisee not to be a single entity for purposes of determining whether the defendant had the required statutory number of employees for purposes of bringing a Title VII action against it. In that case, the court held that although the franchisor may have stringently controlled the manner of the franchisee's operations, conducted frequent inspections, and provided training for franchise employees, the franchisor had no direct control over the franchisee's operations as would be found in the case of integrated companies. *Burdi, supra*, at 1048. *See also Evans v. McDonald's Corporation*, 936 F.2d 1087 (10th Cir.1991) (restaurant franchisor held not to be employer for purposes of Title VII where record indicated no common management, no centralized control of labor relations, and no common ownership, financial control or control over franchisee's labor relations with franchise employees).

In this case, there is no evidence that the Hilton Corporation controls the Buffalo Hilton, pursuant to its franchise agreement, in such a manner as to find that the Hilton Corporation and the Buffalo Hilton are a single employer. The fact that the Hilton Corporation lends its name and reputation to the Buffalo Hilton, along with providing comment cards for guests of the Buffalo Hilton to return to Hilton Corporation headquarters in Dallas, Texas, is insufficient to find that the Hilton Corporation exercises control over the operation of the Buffalo Hilton or that there are significant common business operations between the two organizations to justify finding a unitary operation. Thus, the court concludes that the number of employees of the Hilton Corporation cannot be combined with the number of employees at the Buffalo

Hilton for purposes of meeting the requirements of 42 U.S.C. § 1981a(b)(3)(D).

Accordingly, the court finds that Plaintiff is subject to the damage limit provided in 42 U.S.C. § 1981a(b)(3)(C), and, as such, the compensatory and punitive damage award must be reduced to comply with the $200,000 statutory limited based only on the employment population of the Buffalo Hilton.

As under the New York Human Rights Law there is no limitation on compensatory damages, the amount awarded for compensatory damages will not be reduced. The punitive damage award, however, must be reduced by $800,000 to comply with federal law as punitive damages may not be awarded under New York law. The jury award of $1,000,000 in punitive damages is therefore reduced to $200,000 in accordance with statutory requirements.

### 3. *Failure to Mitigate Damages*

Defendant asserts that Plaintiff is not entitled to any award for back pay or for front pay because Plaintiff failed to mitigate his damages by seeking substantially similar work following his termination from the Buffalo Hilton. Plaintiff responds first that Defendant waived its right to make a motion as to damages as it did not move for a directed verdict on the issue of damages. Second, Plaintiff contends that, even if there was no waiver, Defendant failed to prove that Plaintiff did not mitigate his damages as Defendant did not, as was its burden, establish that there were substantially equivalent jobs available which Plaintiff could have obtained, or that Plaintiff failed to use reasonable diligence in seeking such a job.

### a. *Waiver*

 As an initial issue, Plaintiff argues that Defendant waived its right to challenge Plaintiff's alleged failure to mitigate damages when Defendant did not move for a directed verdict on the issue of damages at the close of Plaintiff's case, and at the close of proof at trial. The issue of mitigation of damages, under the court's instructions to which Defendant had no objection, went to the jury, who found that Plaintiff mitigated his damages.

Rule 50 of the Federal Rules of Civil Procedure provides that:

> [i]f during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim, counterclaim, crossclaim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1).

Rule 50(b) further provides that when a motion for a judgment as a matter of law "made at the close of all the evidence" is denied, it may be renewed, and if a jury verdict is returned, the district court may, "in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and ... direct the entry of judgment as a matter of law." Fed.R.Civ.P. 50(b). A judgment as a matter of law is limited to those issues "specifically raised in [a] prior motion for a directed verdict." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993). Indeed, "the rule is well established that a motion for directed verdict at the close of all the evidence is a prerequisite for [judgment as a matter of law]." *Hilord Chemical Corp. v. Ricoh Electronics, Inc.*, 875 F.2d 32, 37 (2d Cir.1989). This procedural requirement may not be waived as a "mere technicality." *Cruz v. Local Union Number 3 of Intl. Brotherhood of Electrical Workers*, 34 F.3d 1148, 1155 (2d Cir.1994). Relief from this requirement is only available to prevent a "manifest injustice." *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir.1986).

In this case, at the close of the Plaintiff's case, Defendant moved for a directed verdict pursuant to Fed.R.Civ.P. 50(a) as follows:

> Your honor, defendant moves pursuant to Rule 50(a) of the Federal Rules, for a judgment as a matter of law ... That there is no credible evidence upon which a reasonable jury could find that Mr. Greenway was terminated because of his disability. Because he was HIV positive. The worst, assuming the jury believes every-

thing in the plaintiff's favor, as indeed you must—you must so consider, for the purpose of this motion, there is simply no evidence of disability discrimination here.

There is a *post hoc ergo propter hoc* argument that is to say that because it happened after he took his disability leave, and marked on it that he was HIV positive that therefore, the defendant must have— must have acted on. it in disciplining him. We submit that without more, that is simply insufficient as a matter of law.

Trial Transcript, dated October 16, 1996, at pp. 102–03.

After hearing limited argument on the motion, the court denied Defendant's motion for a directed verdict on the ground that, based on the circumstantial evidence presented, the issue turned on credibility, which was for the jury to decide. Trial Transcript, dated October 16, 1996, at p. 108. No mention was made of the issue of mitigation.

Thereafter, at the end of the presentation of proof, Defendant made a motion for a judgment as a matter of law, with defense counsel stating, "at this time, since the evidence is closed, we would move for a judgment as a matter of law." Trial Transcript, dated October 17, 1996, at p. 195. Defense counsel did not clearly state whether Defendant was moving for a judgment as a matter of law on the issue of liability or damages.

Plaintiff maintains that Defendant cannot bring a motion for a judgment as a matter of law on the ground that Plaintiff failed to mitigate his damages, as no motion on the issue of damages was presented to the court pursuant to Rule 50(a) or (b) at the time of trial. In response, Defendant claims that, in its discussions with the court, and in numerous pretrial conferences, the issue of Plaintiff's failure to mitigate was always mentioned, and that Plaintiff cannot claim that he did not have notice of Defendant's contention that Plaintiff did not use reasonable diligence to seek other employment following his termination.

■ Although Rule 50 requires a motion for a directed verdict to state the "specific grounds," the rule does not define how specific the grounds must be. *Anderson v.*

*United Telephone Company of Kansas,* 933 F.2d 1500, 1504 (10th Cir.1991). Because the requirement of Rule 50 that a directed verdict must precede a motion for a judgment as a matter of law is "harsh in any circumstance," a motion for a directed verdict "should not be reviewed narrowly but rather in light of the purpose of the rules to secure a just, speedy, and inexpensive determination of a case." *Anderson, supra,* at 1502 (citing 9 C. Wright & A. Miller, Federal Practice and Procedure § 2537, at 597 n. 32 (1971) (quoting *Mosley v. Cia. Mar. Adra S.A.,* 362 F.2d 118, 121–22 (2d Cir.), *cert. denied,* 385 U.S. 933, 87 S.Ct. 292, 296, 17 L.Ed.2d 213 (1966))).

■ In this case, Defendant moved for a directed verdict on liability at the end of the Plaintiff's case. At the close of proof, Defendant moved for a judgment as a matter of law, without specifying the issues. First, the court notes that Defendant's defense of failure to mitigate damages was always at issue, and discussed repeatedly before the court, with Plaintiff's counsel, prior to and during the trial. For example, in its Pretrial Statement filed September 23, 1996 (Doc. # 29), Defendant stated at p. 5, "[t]here is also an issue that Plaintiff has failed to make reasonable efforts to mitigate his damages in this case. Plaintiff has produced no evidence that he has taken any steps to find comparable employment." Therefore, Plaintiff cannot now state that he did not have notice of Defendant's contention that Plaintiff had failed to mitigate his damages. Second, while it is clear that Defendant moved for a directed verdict on liability only at the close of Plaintiff's case, the burden to prove a failure to mitigate damages was on Defendant, *Clarke v. Frank,* 960 F.2d 1146, 1152 (2d Cir.1992), so that Defendant may not have made a motion based on a failure to mitigate damages until the close of its own case. At the close of proof, Defendant made a general motion for a judgment as a matter of law.

Although Defendant concedes it could have been more specific, the court concludes that Defendant's motion for a judgment as a matter of law at the end of proof is sufficient to constitute a motion for a directed verdict on

all issues. Plaintiff was aware of Defendant's allegation that there was a failure by Plaintiff to mitigate his damages by virtue of pretrial discussions between counsel and the court, as well as Defendant's questioning of witnesses at trial, including Defendant's cross-examination of Plaintiff which pointedly referred to Defendant's position that Plaintiff failed to seek comparable employment. *See Acosta v. Honda Motor Co., Ltd.,* 717 F.2d 828, 831–32 (3d Cir.1983) (holding that despite defense counsel's lack of specificity in its motion for a directed verdict, other colloquies and discussions between the parties and the court cured any deficiencies in defendant's Rule 50 motion); *Thezan v. Maritime Overseas Corp.,* 708 F.2d 175, 179 (5th Cir. 1983) (technical precision is not necessary in stating grounds for a Rule 50 motion so long as counsel's argument makes clear the defenses being relied upon).

Thus, the court finds that Defendant did not waive his right to bring a post-trial motion for relief on the basis that Plaintiff failed to mitigate his damages even though the directed verdict motion was not specific. Accordingly, the court will proceed to discuss the merits of Defendant's argument on this issue.

### b. *Failure to Mitigate*

■■■■■■ A prevailing plaintiff in an employment discrimination action has a duty to mitigate his damages by exercising reasonable diligence in seeking substitute employment that is substantially similar to his former employment or risk having the amount of any damages awarded reduced by the amount that could have been earned. *Ford Motor Co. v. Equal Employment Opportunity Commission,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982); *Clarke v. Frank,* 960 F.2d 1146, 1152 (2d Cir.1992); *Dailey v. Societe Generale,* 915 F.Supp. 1315, 1321 (S.D.N.Y.1996); *Reilly v. Cisneros,* 835 F.Supp. 96, 99 (W.D.N.Y.1993). In determining whether a plaintiff has met his duty to mitigate, a court must look at whether the plaintiff has used reasonable diligence in his search for comparable employment. *See Dunlap–McCuller v. Riese Organization,* 980 F.2d 153, 159 (2d Cir.

1992), *cert. denied,* 510 U.S. 908, 114 S.Ct. 290, 126 L.Ed.2d 239 (1993) (plaintiff has the duty to exercise reasonable diligence in mitigating damages by seeking alternative employment); *Reilly, supra,* at 99.

■■■■■■ The defendant, however, bears the ultimate burden of proving that a plaintiff has not fulfilled his duty to mitigate damages. *Clarke, supra,* at 1152. In order to prove a failure to mitigate damages, a defendant "must show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment" in order to meet its "extremely high" burden of proving a failure to mitigate. *Brooks v. Fonda–Fultonville Central School District,* 938 F.Supp. 1094, 1109 (N.D.N.Y.1996). Indeed, a "defendant's burden of proving a lack of diligence is not satisfied merely by a showing that there were further actions that plaintiff could have taken in pursuit of employment." *Equal Employment Opportunity Commission v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 925 (S.D.N.Y.1976), *aff'd,* 559 F.2d 1203 (2d Cir.1977), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). Rather, defendant must show that the plaintiff's actions in attempting to seek employment were unreasonable. In evaluating a plaintiff's course of conduct, the court should consider that the "range of reasonable conduct is broad and the injured plaintiff must be given the benefit of every doubt in assessing [his] conduct." *Kallir, Philips, Ross, Inc.,* 420 F.Supp. at 925. To satisfy its burden, a defendant must therefore establish (1) that the damage suffered by the plaintiff could have been avoided, *i.e.,* that there were suitable positions available which plaintiff could have discovered and for which he was qualified, and (2) that the plaintiff failed to use reasonable care and diligence in seeking such position. *Aguinaga v. United Food and Commercial Workers Int'l. Union,* 993 F.2d 1463, 1474 (10th Cir.1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994).

In this case, Defendant argues that Plaintiff failed to look for any bartending or other comparable positions with any hotels, motels, or restaurants in the Buffalo area following his discharge, and that, as such, Plaintiff is

precluded from seeking back pay or front pay as he failed to mitigate his damages. Plaintiff asserts that he did seek work, in the form of temporary employment through an agency, and by attending a school to retrain for a new career as a machinist, but that he could not go back to work as a bartender as he was disillusioned with that occupation after the bad experience he had with the Buffalo Hilton.

At trial, Plaintiff testified as follows:

Q. Have you worked since February of 1994?

A. Yes, I have.

Q. And who have you worked for?

A. I worked for Power Force International, a temporary agency.

Q. And what was—do you still work for them now?

A. No, I do not.

Q. What was the time frame that you worked for Power Force?

A. I started employment in May of 1994 up until October of 1994.

Q. And have you worked as a bartender since your termination from the Buffalo Hilton?

A. No, I have not.

Q. Have you applied for bartending positions?

A. No, I have not.

Q. Why not?

A. After the experience that I dealt with in the Hilton, I backed away from anything related to that industry.

Q. Danny, what have you done since October of 1994 employment wise?

A. I have not worked.

Q. Okay. Have you—what—have you done anything else geared towards working?

A. Yes. I did get into a retraining program.

Q. And what was the retraining program for?

A. Machinist.

Trial Transcript, dated October 11, 1996, at pp. 35–36.

Plaintiff continued as follows:

Q. And have you found any work in the area of machinist?

A. No, I have not.

Q. Danny, you've carried the HIV virus since your hire with the Hilton in December of '87. Did the virus have any affect on your abilities to do your job as a bartender?

A. No, not at all.

Trial Transcript, dated October 11, 1996, at p. 36.

On cross-examination, Plaintiff testified as follows:

Q. Have there been bartender jobs available in the City of Buffalo since February 3, 1994?

A. I would have to assume yes.

Q. I mean how many—let's talk about the hotels that are available like the Buffalo Hilton. There's the Hyatt, is there not?

A. Yes, there is.

Q. And there's the Renaissance out at the airport, right?

A. That's correct.

Q. What else is there in the city?

A. In the city?

Q. Yeah.

A. Hotels. Maybe the Holiday Inn, that's the only one I can think of.

Q. Okay. And there are numerous, numerous bars, right?

A. That's correct, sir.

Q. I mean, there's the Anchor Inn, even I know about the Anchor Inn with famous Buffalo wings. They also have bartenders?

A. Um-hmm.

Q. And you didn't apply for any of those jobs?

A. No, I did not.

Trial Transcript, dated October 11, 1996, at p. 39.

■■■■ A plaintiff fails to mitigate adequately and therefore is entitled to neither back pay nor front pay to the extent that he fails to accept substantially similar employment, fails diligently to search for alternative work, or voluntarily quits alternative employ-

ment without good reason. *Reilly, supra*, at 99. While the burden of mitigation does not require success, it requires that a plaintiff show an honest, good faith effort to obtain comparable employment. A plaintiff must demonstrate that he made and is making an effort that is reasonably calculated to find comparable work. *Reilly, supra*, at 100. In order for the work to be comparable or substantially similar, the new position must afford a plaintiff virtually identical promotional opportunities, compensation, job responsibilities, working condition, and status as the former position. *Reilly, supra*, at 99. The reasonableness of a plaintiff's search for comparable employment must be assessed in light of the circumstances of the individual case. *Id.*

Based on Plaintiff's testimony, it appears that Plaintiff did not actively seek comparable employment following his termination. However, in order to establish the Plaintiff failed to mitigate damages, Defendant was also required to show that there were suitable positions for which Plaintiff could have applied but did not.

In *Ali v. City of Clearwater*, 915 F.Supp. 1231 (M.D.Fla.1996), in the context of a summary judgment motion, a plaintiff filing suit under the Rehabilitation Act of 1973, 29 U.S.C. § 794, stated in his deposition that he had not sought any employment since his termination by the defendant. In denying the defendant's motion for summary judgment for failure to mitigate damages, the court held that, although the defendant had presented evidence as to the plaintiff's failure to use reasonable diligence to seek alternative employment, it had failed to point out any factual basis showing that there were suitable positions which the plaintiff could have discovered for which the plaintiff was qualified. *Ali, supra*, at 1242. Similarly, in *Campbell v. Pennsylvania College of Optometry*, 1995 WL 489134 at *7 (E.D.Pa.1995), a defendant's summary judgment motion was denied in the context of an employment discrimination action where the court found that, while the plaintiff had not looked for alternative work, the defendant had not presented any proof of available employment. The court stated that, without proof that

suitable job openings existed, the court could not hold that the plaintiff had breached her duty to mitigate damages. *Campbell, supra*, at *7.

At trial, Richard Kotas, the Buffalo Hilton's personnel manager, testified regarding other hotels in the Buffalo area that were the Hilton's main competition, namely the Hyatt–Regency, the Holiday Inns, and the Radisson, all in the downtown Buffalo area, and the Sheraton and the Marriott in the Buffalo suburbs. Trial Transcript, dated October 17, 1996, at p. 170–71. Kotas testified that these hotels had similar benefit plans to that of the Hilton's. *Id.* Kotas did not offer any testimony as to whether these hotels were hiring bartenders following Plaintiff's termination, or whether substantially similar employment was available after the time of Plaintiff's termination that would have offered him "virtually identical promotional opportunities, compensation, job responsibilities, work conditions and status" as Plaintiff's position with the Buffalo Hilton. *Reilly, supra*, at 100. Neither did any other defense witness. The only testimony regarding available alternative employment came from Plaintiff himself on cross-examination, where he testified that he "assume[d]" that other bartending positions were available after his termination. However, defense counsel did not elicit any testimony that Plaintiff was aware of any specific job openings, but only that he did not apply for a position at several establishments which employed bartenders.

In this case, the jury, after hearing all of the evidence, found that Plaintiff had reasonably mitigated his damages. As stated, in ruling on a judgment as a matter of law, the court must "consider the evidence in the light most favorable to the [non-moving party] and ... give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence." *Concerned Area Residents for the Environment, supra*, at 117. Even if the jury were to have found that Plaintiff did not make a good faith effort to find alternative employment, considering the evidence in the light most favorable to Plaintiff, as the court is required to do, the jury could have reasonably found that Defendant had not shown

that there were substantially similar positions available to Plaintiff following his termination from the Buffalo Hilton, or inferred that no such positions were available as no proof of their availability was offered by Defendant, thereby discounting Plaintiff's "assumption," in response to Defendant's cross-examination, that such jobs might be available. As such, the court may not overturn the jury verdict in Plaintiff's favor on mitigation of damages.

#### c. *Amount of Back Pay*

■ In its verdict, the jury awarded Plaintiff $65,000 in back pay. Defendant argues that this award is excessive as, according to Plaintiff's 1993 tax return, he earned approximately $9,000, even though Plaintiff testified at trial that he earned $20,000 in 1993 after including tip income. Further, Defendant contends that, even if the jury accepted Plaintiff's testimony that he earned $20,000 in 1993, Plaintiff is only entitled to $44,500 as a back pay award, which constitutes compensation for two years and eight months [8] at an annual rate of $20,000, totalling $54,000, less $9,500 in earnings after Plaintiff's termination. Plaintiff asserts that he is entitled to the $65,000 award, although he concedes that his post-termination earnings of $7,700 should be deducted from the award.[9]

In *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir.1992), the Second Circuit refused to adjust an award for backpay where the award from the jury was approximately $45,000 more than that calculated by the plaintiff's expert. Holding that the award did not "shock the conscience," nor did it "deviate substantially from what would be reasonable compensation," the court found no basis to disturb the award despite the fact that it was higher than what plaintiff's expert anticipated that the plaintiff would have earned.

Similarly, in this case, based on Plaintiff's claimed earnings of $20,000 per year, the actual amount of back pay until the date of trial would be $54,000. However, this calculation assumes that Plaintiff would receive no pay raises, and that his tips would remain the same. The court finds that the jury's award of $65,000 in back pay, which is $11,000 more than the actual calculation of $54,000 does not shock the conscience, nor does it deviate substantially from what would be reasonable compensation. Thus, the court holds that the award of $65,000 in back pay should stand. Subtracted from this amount, however, should be the amount which Plaintiff earned following his termination, which is agreed to be $7,700.

Therefore, judgment for back pay in the amount of $57,300 should be entered.

#### 4. *Pre–Judgment Interest*

■ District courts may award prejudgment interest on back pay awards in employment discrimination cases. *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134 (2d Cir.1993), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir.1992). The purpose of a prejudgment interest award in a wrongful termination case is to compensate a plaintiff for the loss of the use of money that the plaintiff otherwise would have earned had he not been unjustly discharged. *Chandler v. Bombardier Capital, Inc.*, 44 F.3d 80, 83 (2d Cir.1994). Failure on the part of the district court to make such an award is ordinarily considered by the Second Circuit to be an abuse of discretion. *Clarke, supra*, at 1153–54.

■ Plaintiff contends that the appropriate rate of interest should be 9% per annum based on New York Civil Practice Law and Rules § 5004, and that the interest should be based on one-half of the $65,000 awarded by the jury, or $32,500, as an average amount for the two year and eight month period. Defendant does not dispute that Plaintiff is entitled to prejudgment interest on any back pay award, but contends that the appropriate rate of interest is not 9%, but, rather, 6.07%,

---

**8.** The period from February 3, 1994, the date of Greenway's discharge, until October 18, 1996, the date the verdict was rendered in this case, was two years and eight months.

**9.** At oral argument, the parties agreed that Plaintiff earned $7,700 after his termination, not $9,500 as previously stated by Defendant.

the average interest rate on U.S. Treasury bills from February 3, 1994 until December 7, 1995, pursuant to 28 U.S.C. § 1961.

In *Luciano v. Olsten Corp.*, 912 F.Supp. 663 (E.D.N.Y.1996), the court rejected the 9% New York statutory rate in favor of the United States 52–week treasury bill rate, referred to in 28 U.S.C. § 1961, on the basis that it would ensure that "the plaintiff [was] sufficiently, but not overly, compensated." *Luciano, supra,* at 676–77 (citing *Ware v. ABB Air Preheater, Inc.,* 1995 WL 574464 (W.D.N.Y.1995)) (stating that the Second Circuit approves a flexible and nonrigid approach to the calculation of prejudgment interest); *Dailey v. Societe Generale, supra,* at 114 n. 4; *Rao v. New York City Health and Hospitals Corp.,* 882 F.Supp. 321, 327, 329 (S.D.N.Y.1995). This court accepts the approach of the *Luciano* court, and holds that the prejudgment interest shall be computed pursuant to 28 U.S.C. § 1961, at a rate of 6.07%, as calculated by Defendant.

■ "The objective of fully compensating the plaintiff is best effectuated by dividing the jury's back pay award evenly over the relevant time period for the purposes of calculating prejudgment interest." *McIntosh v. Irving Trust Co.,* 873 F.Supp. 872, 884 (S.D.N.Y.1995). Therefore, Plaintiff's proposal to use an average amount for calculating back pay is proper. The court notes that the amount of backpay to be awarded is $57,300, not $65,000, and that the annualized loss over the two year and eight month period at issue is $19,697 in 1994, $21,487 in 1995, and $16,116 in 1996. The court hereby awards prejudgment interest on the backpay award of $57,300 in the amount of $3,768 through December 31, 1996 plus an additional $10.16 per day for each day in 1997 until judgment is entered, calculated as follows:

<u>1994:</u> $19,687 at 6.07% interest rate, compounded annually

| | | $19,687 |
|------------|--------|---------|
| 1/95–12/95 | $1,196 | 20,893 |
| 1/96–12/96 | 1,268 | 22,161 |

<u>1995:</u> $21,487 at 6.07% interest rate, compounded annually

| | | $21,487 |
|------------|--------|---------|
| 1/96–12/96 | $1,304 | 22,791 |

<u>1996:</u> $16,116 $16,116

Plaintiff is entitled to $61,068 as of December 31, 1996, representing backpay and prejudgment interest. At 6.07%, interest accrues on this amount at the rate of $10.16 per day. Plaintiff is entitled to an additional $10.16 per day in 1997 up to the date that judgment is entered, representing interest earned on the compounded amount in 1997.

### 5. *Front Pay*

Plaintiff also seeks front pay on the basis that, as the jury found that Plaintiff mitigated his damages, Plaintiff is entitled to an award of front pay to compensate him for the estimated present value of lost earnings that are reasonably likely to occur between the date of judgment and the time when Plaintiff can assume a new position. In this case, Plaintiff is seeking an award of front pay for twenty years at $30,000 per year, for a total of $600,000 before a present value calculation.

Defendant asserts that front pay should be denied as Plaintiff failed to mitigate his damages. Alternatively, Defendant contends that, even if back pay is awarded, Plaintiff is not entitled to front pay as the award of back pay was sufficient to make Plaintiff whole. Finally, Defendant claims that, if front pay is awarded, it should be awarded for a limited period of time, and that a period of six months is sufficient.

■ Decisions regarding the propriety of front pay awards fall within the sound discretion of the district court. *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 145 (2d Cir.1993). "Front pay may not be an appropriate remedy in all situations, but under particular circumstances it may be appropriate when reinstatement is either impossible or impracticable." *Frank v. Relin,* 851 F.Supp. 87, 93 (W.D.N.Y.1994). As reinstatement has not been proffered as an option in this case, the court will examine the front pay issue.

■ Front pay "may properly be awarded where the calculation of plaintiff's likely mitigated earnings and the income [he] would have earned, but for [his] unlawful

termination, do not involve 'undue speculation.'" *Frank, supra,* at 93. The decision to award front pay is discretionary, and a request for front pay may be denied if the court finds that the back pay award is sufficient to make the plaintiff whole. *Saulpaugh, supra,* at 145. Similar to the standard for determining the appropriateness of an award of backpay, a plaintiff has a duty to exercise reasonable diligence in seeking alternative similar employment or risk having the amount of front pay damages reduced by the amount that could have been earned. *Reilly v. Cisneros, supra,* at 99. A plaintiff must show a "good faith effort" and the reasonableness of the plaintiff's actions must be assessed in light of the individual circumstances of the case. *Reilly, supra,* at 100. In determining whether the plaintiff is entitled to front pay, the court must examine whether he has used reasonable diligence in his job search, and the burden lies with the defendant to show that the plaintiff did not exercise such diligence. *Reed v. A.W Lawrence & Co., Inc.,* 889 F.Supp. 594, 599 (N.D.N.Y.1995). "In order to successfully thwart a front pay award, defendant must 'show that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment.'" *Reed, supra,* at 599 (quoting *EEOC v. Kallir, Philips, Ross, Inc., supra,* at 925).

As stated previously in the discussion relating to back pay, it is undisputed that Plaintiff did not actively seek comparable employment following his termination. Plaintiff worked for a temporary agency from May, 1994 until October, 1994, earning approximately $7,700 during that time, but did not accept further employment in the bartending industry because of his experience with the Buffalo Hilton. Plaintiff then entered a retraining program preparing him for employment as a machinist, but, at the time of trial, Plaintiff had been unable to find employment in that field. As noted, however, Defendant did not establish that, following Plaintiff's termination, similar jobs with comparable wages, benefits, and job responsibilities were available. On that basis, the court declined to disturb the jury's finding that Plaintiff did not fail to mitigate dam-

ages. As such, the court will not conclude that the course of conduct followed by Plaintiff was so deficient as to constitute an unreasonable failure to seek employment.

Nonetheless, the court does not find it appropriate to award the full amount of front pay sought by Plaintiff. Plaintiff is seeking an award of front pay which essentially would compensate him for the rest of his life. The court finds this claim to be excessive. There is no evidence in the record that Plaintiff is unable to work. Rather, the evidence presented showed that Plaintiff is asymptomatic, and that his HIV positive status did not affect his ability to perform his job responsibilities in any fashion. As such, the court awards $10,000 in front pay, representing compensation for six months, an amount that the court finds, in its discretion, to be appropriate.

### 6. *Future Damages*

In its verdict, the jury awarded Plaintiff $50,000 for future health insurance premiums, and $324,000 for future medication costs, representing the cost of the prescription medications which Plaintiff takes for his HIV positive condition at a cost of approximately $1,100 per month. Defendant now argues that Plaintiff is not entitled to any future damages as he failed to mitigate his damages, and that, even at the time of trial, he was not making any payments for health insurance coverage although he was entitled to maintain his policy from the Buffalo Hilton under federal law. Further, Defendant claims that Plaintiff's medication has been provided to him free by the State of New York, under a state sponsored medical assistance program, and that there is no evidence in the record that the cost of medication would ever be borne by Plaintiff.

In arguing against these future damages, Defendant first contends that the questionnaire given to the jury (Court Exhibit 1) to assist in formulating its verdict "permitted, indeed encouraged, the jury to speculate in a manner inconsistent with the uncontroverted record evidence." Defendant's Memorandum of Law for Reduction of Damages, at p. 12. Defendant specifically cites questions 5,

6, 7, and 8 of the jury questionnaire. These questions, relating to Plaintiff's ability to obtain health insurance benefits, and the cost of his medications, asked as follows:

Question 5. Do you find that if Mr. Greenway had sought and obtained substantially equivalent or comparable employment that he would have been able to also obtain health insurance benefits from his new employer substantially similar to those he received prior to his termination?

Question 6. If you find that Mr. Greenway would *not* have been able to obtain health insurance benefits from a new employer, calculate the total cost of health insurance from the date of Mr. Greenway's termination, February 3, 1994, until the time you find Mr. Greenway would no longer be employed at the Buffalo Hilton Hotel had he not been terminated on that date.

Question 7. Do you find that if Mr. Greenway had sought and obtained substantially equivalent or comparable employment that provided him with comparable health insurance substantially similar to that which he received prior to his termination, do you also find that Mr. Greenway would also have been able to obtain the cost of medication required to treat any medical conditions of Mr. Greenway?

Question 8. If you find that Mr. Greenway would *not* have been able to obtain the cost of the medication required to treat any medical conditions of Mr. Greenway, calculate the total cost of medication required to treat Mr. Greenway's condition from the date of Mr. Greenway's termination, February 3, 1994, until the time you find Mr. Greenway would no longer be employed at the Buffalo Hilton Hotel had he not been terminated on that date.

The jury answered "No" to Questions 5 and 7, finding that Greenway would not have received comparable health insurance, and that he would not have been able to obtain the cost of medication required to treat his medical condition. Evidence presented at trial established that, under the Buffalo Hilton's health insurance policy, Greenway was entitled to retain his insurance benefits for a cost of approximately $150 per month for a period of eighteen months, (Trial Transcript, dated October 11, 1996, at p. 121; Trial Transcript, dated October 17, 1996, at p. 169), pursuant to federal law, and that the cost of his medications was approximately $1,100 per month, (Trial Transcript, dated October 11, 1996, at p. 34), although, at the time of trial, Greenway was receiving the medication cost free pursuant to New York State program for low income persons.[10] As stated, the jury awarded Greenway $50,000 for future health insurance premiums, and $324,000 for the cost of future medications.

Without reaching the merits of Defendant's argument against the award of these future damages, the court notes that the jury questionnaire was formulated by the court after considerable discussion between the court and both parties. Counsel met with the court on the afternoon of October 17, 1996, following the end of testimony, to review the proposed jury instructions and jury questionnaire. Following a ninety minute meeting with counsel, the final version of the jury instructions and jury questionnaire was completed. Prior to the beginning of closing argument on October 18, 1996, the jury instructions and jury questionnaire were given to both counsel for review. At that time, no objection to either the instructions or the questionnaire was made. Summations before the jury then commenced, following which the jury was charged, and the questionnaire was explained as part of the instructions and given to the jury. The jury then retired to begin deliberations. At that time, the court asked counsel, for the record, if there were any objections to the instructions as given. Consistent with the outcome of the previous day's charge conference, both counsel for the Plaintiff and for the Defendant stated that there were no objections. Trial Transcript, dated October 18, 1996, at pp. 96–97. After the verdict was reached, and stated in open court, the court reminded

---

**10.** The jury was not informed that Greenway was receiving his medication under the New York State program.

counsel to timely file any post-verdict motions. Again, no objection to the instructions or the questionnaire was made by Defendant.

 Failure to object to a jury instruction or to a form of an interrogatory prior to the jury's retiring results in a waiver of the objection. *Lavoie v. Pacific Press & Shear Co., a Div. of Canron Corp.,* 975 F.2d 48, 54 (2d Cir.1992). As Defendant clearly made no objection either to the jury instructions or the the the form or content of the jury questionnaire, the court finds that any objection is waived.

Further, while Defendant argues that Plaintiff is receiving a double recovery because the award for the health insurance premiums which Plaintiff received would purchase his medications, thereby obviating the need for a second award for the cost of medications, the court finds that this argument is not sufficient to overcome Defendant's waiver. In *Coastal Fuels of Puerto Rico v. Caribbean Petroleum Corp.,* 79 F.3d 182 (1st Cir.1996), the court found that a post-trial argument by the defendant that a finding of price discrimination and tort damages could constitute duplicate damage recoveries afforded no basis for the grant of a new trial where the defendant failed to object to the form or content of special interrogatories which the jury answered, noting that, if the defendant had objected, the district court might have corrected any overlap problem. *Coastal Fuels of Puerto Rico, supra,* at 201. As such, this court concludes that Defendant's failure to object to either the jury instructions or the jury questionnaire prior to the time the jury retired to deliberations constitutes a waiver as to any objection regarding the charge or the questions put to the jury.

In any event, Defendant's argument that Plaintiff has the burden to mitigate his damages with respect to future health insurance costs must fail. In his testimony, Richard Kotas indicated that the main hotels in the area, such as the Hyatt, had comparable medical benefits to those offered by the Buffalo Hilton, however, in cross-examination, he conceded that he did not know whether the policies offered by the other hotels contained pre-existing condition clauses which may have excluded Greenway's condition. After hearing all of the evidence, the jury specifically found that Plaintiff, even if he found comparable employment, would not have received comparable health insurance coverage or the cost of his medication. The caselaw cited by Defendant simply recites the principle of mitigation of damages in the context of two breach of contract actions, and a commercial litigation. The court does not find this authority persuasive, especially in the context of a post-trial motion to set aside a verdict.

### 7. *Collateral Source*

Secondly, Defendant asserts that, pursuant to New York Civil Practice Law & Rules § 4545(c) ("§ 4545(c)"), as Plaintiff's health insurance benefits would cover the cost of his medications, and that, in any event, Plaintiff has no cost because of his participation in a New York program providing the medications free of charge, Plaintiff is not entitled to an award of $324,000 for future medications cost.

 The collateral source doctrine in New York holds that, as a general rule, damages cannot be mitigated or reduced because of payments received by an injured party from a source wholly independent of and collateral to the wrongdoer. *Silinsky v. State–Wide Insurance Co.,* 30 A.D.2d 1, 289 N.Y.S.2d 541, 546 (2d Dept.1968). It is well established that damages recoverable for a wrong are not diminished even though the injured party has been wholly or partly indemnified for his loss by insurance maintained by him and to the procurement of which the wrongdoer did not contribute. *Healy v. Rennert,* 9 N.Y.2d 202, 213 N.Y.S.2d 44, 46–47, 173 N.E.2d 777, 778 (1961). An exception to this rule has been enacted by the New York legislature whereby in any action to recover damages for personal injury, injury to property, or wrongful death, the court may consider whether any costs of medical care, dental care, custodial care, rehabilitation services, loss of earnings or other economic loss will be replaced or indemnified, in whole or in part, from any collateral source such as insurance. N.Y.Civ.Prac. L. & R. § 4545(c) (McKinney 1990).

Defendant in this case contends that an employment discrimination action is by nature a tort action for a personal injury, and thus, the court should consider that Plaintiff's medication costs will be covered by health insurance, the New York State program, or both. Plaintiff argues that § 4545(c) does not apply to an employment discrimination action. Plaintiff further asserts that the New York State program providing the medication free of charge to Plaintiff is only for low income persons, and that, once judgment is entered in this case, Plaintiff will no longer be eligible for the program, and thus not able to obtain his medications in that fashion. Plaintiff's Memorandum of Law in Response to Defendant's Motion for a New Trial, dated November 22, 1996, at pp. 10–11. Defendant has not disputed this representation.

The Second Circuit has not yet ruled on the issue of whether payments from a collateral source should be deducted from an award to a plaintiff in an employment discrimination action based on both federal and state law. However, the Second Circuit has noted, in the context of an employment discrimination case, that "while collateral source payments do represent an additional benefit to the plaintiff, we note a sister circuit's view that '[a]s between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer.'" *Promisel v. First Amer-*ican Artificial Flowers, Inc., 943 F.2d 251, 258 (2d Cir.1991), cert. denied, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992) (quoting *Maxfield v. Sinclair International,* 766 F.2d 788, 795 (3d Cir.1985) (holding that social security benefits should not be set off from ADEA lost wages award), cert. denied, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986)).

The cases cited by Defendant to support its contention that an employment discrimination action is a tort action subject to § 4545(c) do not directly address the issue, rather, they state that discrimination actions are injuries to the personal rights of individuals and can be classified as tort actions. However, § 4545(c) does not, by its terms, apply to all tort actions.[11] Simply characterizing an employment discrimination claim as a tort action does not bring the action within § 4545(c). Further, the court's research has not revealed, nor has the Defendant been able to offer, any authority that § 4545(c) applies to an employment discrimination claim. As the New York Court of Appeals has stated that § 4545 should be construed "in the narrowest sense that its words and underlying purposes permit," *Oden v. Chemung County Industrial Development Agency,* 87 N.Y.2d 81, 637 N.Y.S.2d 670, 672, 661 N.E.2d 142, 144 (1995), this court will not extend the meaning of § 4545(c) to include an employment discrimination case such as the instant action.

---

**11.** Although the commentary to § 4545 states that "[t]he operative language of CPLR 4545(c) is identical to that of subdivision (a) except that subdivision (c) includes all types of tort actions," the court believes this statement to be overly broad. There is no authority to support this statement, and in fact, the court's research reveals no cases where § 4545 has been applied to a tort action such as a claim for defamation, slander, libel, or other types of intentional torts. More telling is the fact that New York courts have never applied § 4545 to an employment discrimination action under the New York Human Rights law. Further, the court notes that § 4545 was originally implemented in order to reduce medical malpractice premiums by reducing the amount of awards in malpractice actions. Commentary 4545:1 to N.Y.Civ.Prac. L. & R. § 4545, at p. 344 (McKinney 1990). Also, the New York Court of Appeals has noted that, according to § 4545's legislative history, "rising insurance costs" was one of the main reasons that motivated the legislature to modify the common-law collateral source rule. *Oden v. Chemung County Industrial Development Agency,* 87 N.Y.2d 81, 637 N.Y.S.2d 670, 673, 661 N.E.2d 142, 145 (1995). As employers generally cannot purchase insurance policies in New York to cover against intentional torts such as employment discrimination claims based on disparate treatment, this objective is not advanced in a case such as the instant one, and further argues against the application of § 4545(c) in this context. *See American Management Association v. Atlantic Mutual Insurance Company,* 168 Misc.2d 971, 641 N.Y.S.2d 802, 807–808 (Sup.Ct.N.Y.Cty. 1996) (holding that New York's public policy does not bar insurance coverage for disparate impact employment discrimination, but noting that the State of New York Insurance Department has stated that it is against public policy to provide insurance coverage for intentional acts of discrimination).

Finally, as to Defendant's argument that there are health insurance plans available in the Buffalo area for which Plaintiff is eligible and which would cover the treatment of his HIV positive condition, the court notes that evidence of these plans were not introduced at trial. Thus, Defendant's post-verdict proffer regarding these plans, which are not specified but only referred to in a conclusory fashion, is insufficient to set aside the award for the cost of future medications. Defendant's Reply to Plaintiff's Response to its Post–Trial Motions, dated December 4, 1996, at p. 8 n. 6.

### 7. *Present Value of Future Damages*

 Where there is an award of future damages, the court must reduce the future award to its present value. *Oliveri v. Delta Steamship Lines, Inc.*, 849 F.2d 742, 751 (2d Cir.1988); *Raimondo v. AMAX, Inc.*, 843 F.Supp. 806, 810 (D.Conn.1994). This discounting is required to account for inflation and the ability to profit from current investment, and must be applied to awards for future damages. *DeChico v. Metro–North Commuter R.R.*, 758 F.2d 856, 859–60 (2d Cir.1985). This requires the determination of the appropriate discount rate. *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39–40 (2d Cir.1980), *cert. denied*, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). In the Second Circuit, district courts may utilize a net discount rate of 2% based on the "apparently stable relationship between inflation and interest rates." *Battista v. United States*, 889 F.Supp. 716, 726 (S.D.N.Y.1995) (citing *Doca, supra*, at 39–40).

In this case, the amount of future damages is $384,000, which includes the $50,000 award for future health insurance premiums, the $324,000 award for future cost of medication, and the $10,000 award for front pay. Discounted by 2%, the total future damages to be awarded is $376,320.[12]

### 8. *Attorneys' Fees*

The final issue to resolve is the attorneys' fee application of Plaintiff's counsel. As the prevailing party, Plaintiff is entitled to an award for attorneys' fees, costs and expenses in an action under the ADA. 42 U.S.C. § 12205. Plaintiff's counsel has submitted an application for interim fees and costs in the amount of $188,077.90. Defendant disputes both the time charged and the hourly rate submitted by counsel.

 Federal courts have applied the standard "lodestar" methodology in determining a reasonable amount of attorneys' fees in an action under the ADA. *Dutton v. Johnson County Board of County Commissioners*, 1995 WL 337588 (D.Kan.1995) (citing *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1543–44, 79 L.Ed.2d 891 (1984)). The "starting point" for setting an attorneys' fee is to determine the lodestar figure, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). *See also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986). It is well settled in the Second Circuit that enhancements of the lodestar amount of attorneys' fees are not permissible under fee-shifting statutes. *Maywalt v. Parker and Parsley Petroleum Co.*, 864 F.Supp. 1422, 1435 (S.D.N.Y.1994).

In response to Plaintiff's counsels' fee application, Defendant makes the following objections: (1) duplication of work where both Mr. Marcus and Ms. Giordano attended the deposition of Dr. Rzepkowski, Plaintiff's treating physician; (2) twenty hours of research billed by Mr. Marcus which Defendant asserts is excessive for an attorney of Mr. Marcus' skill and experience; (3) 157 hours billed by Mr. Marcus, and 55 hours billed by Ms. Giordano, under "vague en-

---

12. Defendant asserts that present value should be computed under New York law, specifically N.Y.Civ.Prac. L. & R. § 4111(f) which requires itemized verdicts in actions brought to recover damages for personal injury, injury to property, or wrongful death actions. The actual provision is N.Y.Civ.Prac. L. & R. § 5041(e) which provides that any future damages over $250,000 are to be discounted to present value. For the same reasons as discussed in this Decision, *supra*, regarding N.Y.Civ.Prac. L. & R. § 4545(c), the court finds § 4111(f) and § 5041(e) inapplicable to this case as they pertain to actions for personal injury, injury to property, or wrongful death.

tries" such as reviewing the file, and preparation for trial; (4) duplication of work where both Mr. Marcus and Ms. Giordano attended the depositions of Mr. Scanio and Mr. Wegrynowski, "relatively minor witnesses" in the case; (5) duplication of effort where both Mr. Marcus and Ms. Giordano billed for preparation of pretrial submissions; (6) two entries on October 4, 1996 for Mr. Marcus of 13.8 hours; (7) excessive billing for preparation of post-trial motions; and, (8) billing by Plaintiff's counsel for time spent preparing the motion for attorney's fees. Defendant requests the court to reduce the amount of attorney's fees by 35% to account for the duplicative and excessive number of hours billed.

In response, Mr. Marcus states that the October 4, 1996 entry was a clerical error, and that the hours claimed by Mr. Marcus should be reduced by 13.8 hours. However, Mr. Marcus argues that both he and Ms. Giordano actively participated in and tried the case, and that, as such, the other time expended by both counsel is neither duplicative nor unnecessary. Further, Mr. Marcus asserts that, as he was not involved in this case until just prior to the time of trial, 157 hours for reviewing the file and preparing for trial is not excessive as he had to fully apprise himself of the entire history and discovery throughout two years of litigation, including all pleadings, depositions, and the EEOC administrative file. As to the pretrial submissions, Mr. Marcus asserts that both he and Ms. Giordano had primary responsibility for separate aspects of the submissions, and so the hours billed are not duplicative.

■ Regarding the presence of two attorneys at the depositions of Dr. Rzepkowski, Mr. Scanio, and Mr. Wegrynowski, "prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions." *New York State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983). Nevertheless, where two attorneys appear at a deposition on behalf of a single client, they have some burden to show "that each had a distinct responsibility in the case necessitating his or her presence...." *Kronfeld v. Transworld Airlines, Inc.*, 129 F.R.D. 598, 604 (S.D.N.Y.

1990). Mr. Marcus asserts that both counsel participated in the trial of the matter, and that the trial of a complex discrimination case such as the instant case could not be handled "piecemeal" with one counsel handling one aspect of the case, and the other counsel handling another. Further, Mr. Marcus states that it was "imperative" for each counsel to attend the depositions and preparation of witnesses "in order to ensure consistency and a true team approach." Reply Memorandum of Law, dated December 4, 1996, at p. 5.

■ Although the court is well aware that both Mr. Marcus and Ms. Giordano tried this lawsuit using a team approach, with both counsel questioning and preparing different witnesses, the court finds that Mr. Marcus has not set forth any specific factual reasons that required the presence of both attorneys at each deposition. The court notes that, at trial, Ms. Giordano cross-examined Mr. Wegrzynowski, while Mr. Marcus questioned Dr. Rzepkowski and cross-examined Mr. Scanio. Therefore, the court will deny attorney's fees for Mr. Marcus' preparation and attendance at the deposition of Mr. Wegrzynowski, and will deny attorney's fees for Ms. Giordano's preparation and attendance at the depositions of Dr. Rzepkowski and Mr. Scanio. Mr. Marcus has claimed 19.9 total hours on September 29 and 30, 1996 for preparation for depositions of Scanio and Wegrynowski, for the depositions of Scanio and Wegrynowski, for a pretrial conference with the court, and for general trial preparation. Ms. Giordano has claimed 18.75 total hours on September 28, 29, and 30, 1996 for the same matters. As the hours spent on each individual deposition have not been detailed, based on the information provided, the court will disallow 18.75 hours in attorney's fees for those dates as duplicative. Additionally, the 6.4 hours claimed by Ms. Giordano, on August 26 and 27, 1996, for preparation for and attendance at the deposition of Dr. Rzepkowski will also be disallowed.

■ The court also finds that certain entries on both counsels' time records do not always accurately identify what the nature or subject was of the work performed. For example, there are entries regarding meet-

ings between Mr. Marcus and Ms. Giordano without identification of what was discussed at the meetings. There are also entries which set forth general information such as trial preparation, consideration of legal strategy, and review of file. These deficiencies, while relatively minor, do support some reduction in the amount of hours claimed. In order to prevent the court from evaluating and ruling on each entry, courts have permitted a percentage-based reduction from the number of hours submitted as a means of trimming excess time from the fee request. *Walker v. Coughlin,* 909 F.Supp. 872, 881 (W.D.N.Y.1995) (making a fifteen percent reduction in the total number of non-travel hours requested) (citing cases). This approach will also address Defendant's objection to the claim for twenty hours of research time for Mr. Marcus. Accordingly, the court hereby reduces the hours requested in counsels' fee request by 10%.

Mr. Marcus submitted a total of 463.10 hours and Ms. Giordano submitted a total of 457.85 hours, for a combined total of 920.95 hours. Reducing this amount by 13.8 hours, the clerical error conceded by Mr. Marcus, by 18.75 for excess hours claimed for the Scanio and Wegrzynowski depositions, and 6.4 excess hours for the deposition of Dr. Rzepkowski, the adjusted total is 882 hours. This amount is hereby reduced by 10%, or by 88.2 hours, leaving the total number of reasonable hours expended by Plaintiff's counsel at 793.80 hours.

In the fee request, Mr. Marcus has requested to be reimbursed at a rate of $225 per hour, and Ms. Giordano has requested to be reimbursed at a rate of $175 per hour. Additionally, Mr. Marcus requests that two other attorneys in his office who assisted on the case be reimbursed at a rate of $225 per hour, and that his legal assistant be reimbursed at a rate of $65 per hour. In support of these rates, Mr. Marcus has submitted an affidavit from William A. Price, Esq., an attorney of similar experience to Mr. Marcus, who states firms in the Buffalo area regularly bill between $200 and $250 per hour in an employment discrimination case.

Defendant objects to these rates as inflated, and argues that a reasonable billing rate for Mr. Marcus, who is a partner in his firm, would be closer to $200 per hour, and reasonable billing rate for Ms. Giordano, who has five years experience, would be closer to $125 per hour. Finally, Defendant asserts that the rate being charged for Mr. Marcus' legal assistant is excessive. In support of its argument, Defendant has submitted an affidavit from Peter Powers, Esq., a seven year associate with Harris, Beach & Wilcox, a law firm with offices in Buffalo and Rochester, New York, who asserts that he charges between $100 and $145 per hour depending on the particular matter involved, and that the prevailing local rate for an attorney of Mr. Marcus' experience is $200 per hour, not $225 or $250 per hour.

In response, Ms. Giordano submitted an affidavit attesting that $175 per hour is not excessive, and representing that other attorneys of similar experience have been awarded attorneys fees at a rate of $150 per hour since 1992.

■ A reasonable hourly rate is usually the prevailing market rate "in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984). In *Jacob v. Buffalo Forge,* No. 89–1280 (W.D.N.Y.1995), this court found, in a case that did not go to trial, that the prevailing market rate for a senior level associate was $115 per hour, and for a partner, $150 per hour. *See also Myree v. Local 41, Intl. Brotherhood of Electrical Workers,* 847 F.Supp. 1059, 1065 (W.D.N.Y.1994) (prevailing rate found to be $150 for a partner and $85 for an associate).

■ In this case, a sharply contested employment discrimination case, based on the affidavits submitted by both sides, the court concludes that the prevailing market rate for an attorney of Mr. Marcus' professional level and expertise is $200 per hour. The court also finds that Ms. Giordano's level, that of a senior associate with between five and six years of experience, should be billed at $125 per hour. Mr. Marcus' partners are also entitled to a rate of $200. Finally, the court

finds that Mr. Marcus' legal assistant should be billed at $55 per hour.

Therefore, attorney's fees should be awarded as follows:

| Attorney | Hours Billed [13] | Hourly Rate | Total |
|---|---|---|---|
| David P. Marcus | 379.2 [14] | $200 | $ 75,840 |
| Robert A. Crawford, Jr. | 7.4 | 200 | 1,480 |
| Lawrence J. Violanti | 5.1 | 200 | 1,020 |
| Tamara M. Giordano | 389.4 [15] | 125 | 48,675 |
| Legal Assistant | 12.7 | 55 | 698 |
| TOTAL | | | $127,713 |

As to costs, Plaintiff's counsel has submitted a detailed list of expenses. Most of these expenses appear to be reasonable, except for the claimed expense for meals at trial which is not allowable. Plaintiff's counsels' offices are both in Buffalo, and neither counsel had to travel to attend trial, therefore, normal meals are not reasonable expenses. *See Carrero v. New York City Housing Authority*, 685 F.Supp. 904, 909 (S.D.N.Y.1988). Accordingly, Plaintiff is entitled to costs of $5992.

The total fee award is therefore as follows:

| | |
|---|---|
| Attorneys' fees | $127,713 |
| Costs and expenses | 5,992 |
| TOTAL | $133,705 |

## CONCLUSION

Plaintiff's motions are GRANTED in part, and DENIED in part. Defendant's motions are GRANTED in part, and DENIED in part. The Clerk shall enter judgment for Plaintiff in the amount of $637,388 plus attorneys' fees and costs of $133,705, for a total amount of $771,093 plus interest in accordance with this Decision and Order. A stay on the execution of this judgment shall be in effect until five days after entry of this Decision and Order. Defendant shall post a supersedeas bond in the amount of $775,000. SO ORDERED.

---

**13.** Hours Billed represents the hours claimed by counsel less the ten percent reduction as directed by the court.

**14.** 435.10 claimed hours less 13.8 hours because of clerical error totals 421.30 hours. Difference is ten percent reduction of 42.10 hours.

**15.** 457.85 claimed hours less 25.15 hours based on duplication at depositions totals 432.70 hours. Difference is ten percent reduction of 43.30 hours.