Kimberly A. CASPER, Deanna Caliendo, and Linette Cinelli, Plaintiffs,

v.

LEW LIEBERBAUM & CO., INC., Mark I. Lew, Leonard A. Neuhaus, Brian T. Clendinin, Joseph A. Alagna, Jr., Barry S. Rabkin, Bernard L. Golembe, Marc H. Rabkin, Fred Dorushkin, and Ronald Dorushkin, Defendants.

No. 97 CIV 3016 GEL RLE.

United States District Court, S.D. New York.

Jan. 22, 2002.

Richard S. Missan, Law Offices of Richard S. Missan, Thomas P. Puccio, Law Offices of Thomas P. Puccio, New York City, for Plaintiffs.

## OPINION AND ORDER

ELLIS, United States Magistrate Judge.

By Opinion and Order dated May 24, 1999, this Court determined that plaintiffs' former counsel would be allowed to withdraw from the case, but would be granted a charging lien, to be determined at the conclusion of the case. Plaintiffs have reached a settlement with defendants, and former counsel Lai Lee Chan[1] ("Chan")

---

1. Former counsel Richard Missan submitted, but withdrew, his request for fees. Former counsel Linda Kenney and Thomas Puccio have not sought fees in this action.

**344**

now seeks to enforce the lien. Chan has submitted a request seeking fees in the amount of $786,862.50, which represents compensation for 2256.75 hours at the rate of $350 per hour. Plaintiffs have moved to have the Court reconsider the grant of the charging lien or, in the alternative, to substantially reduce the requested fee. For the reasons which follow, the Court reaffirms the charging lien and holds that former counsel Chan is entitled to a fee of $131,655.

## I. BACKGROUND

### A. The Association with Plaintiffs Commences

This saga began in May 1995 when plaintiff Kimberly Casper ("Casper") had an initial consultation with Chan. Affidavit of Lai Lee Chan ("Chan Aff.") at ¶ 12. Casper had been terminated from her job at Lew Lieberbaum & Co., Inc. ("LLCI"), a brokerage firm on Long Island, New York. *Id.* Casper told Chan about the working environment at LLCI. "[S]he told me other facts—facts which I perceived to be shocking acts of sexual discrimination[.]" *Id.* At the time, Chan was employed by Richard Missan, who did not take contingency cases. Chan, however, was so troubled by Casper's description of the behavior at LLCI that she persuaded Missan to take on the case. "I then told [Missan] that I would like the opportunity to work on the matter and to see what, if anything, I can do for Ms. Casper." *Id.* at ¶ 13. On June 9, 1995, Casper and Missan [2] signed a retainer agreement providing for a one-third contingency fee on any recovery from the case, and requiring that Casper be responsible for expenses.[3] *Id.*, and Exh. 2. Casper's charge with the Equal Employment Opportunity Commis-

sion ("EEOC") was filed the same day. *Id.*

Chan, who had no experience with employment discrimination cases, spent the next eighteen months familiarizing herself with that area of the law. "From May 1995 to November 1996, for over a year, to educate myself ... I researched and read through hundreds of federal court decisions on employment discrimination law[.]" *Id.* at ¶ 14. On November 16, 1996, Chan interviewed Deanna Caliendo ("Caliendo") and secured a retainer agreement the same day similar to the one agreed to by Casper. *Id.* at ¶ 15, and Exh. 3. Chan filed an EEOC charge for Caliendo on November 19, 1996. *Id.* at ¶ 15. On November 25, 1996, Chan interviewed Linette Cinelli ("Cinelli"). *Id.* at ¶ 16. After securing a retainer agreement on December 2, 1996, *Id.* at Exh. 4, Chan filed two EEOC charges for Cinelli, one on December 23, 1996, and another on January 16, 1997, for retaliation. *Id.* at ¶ 16. The EEOC issued separate right-to-sue letters for the three plaintiffs on April 10, 1997, and the plaintiffs then filed this action on April 28, 1997. Complaint ("Compl.") at ¶ 12; Declaration of Paul F. Millus ("Millus Dec.") at Exh. A.

### B. The Complaint Gets Filed

The complaint named as defendants LLCI and various employees of LLCI, and asserted claims for sexual discrimination, retaliation, and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law, New York Executive Law § 296 and the New York City Human Rights Law, New York City Administrative Code § 8–101 *et seq.*, as

---

**2.** Although this and the other retainers were signed by Missan, Chan maintains that she was the de facto counsel for plaintiffs.

**3.** Chan's request for fees does not include a component for expenses. It appears that the expenses were advanced by Missan, and not Chan.

well as claims for assault, battery, slander per se, and intentional infliction of emotional distress. The individual defendants were all officers and employees of defendant LLCI who worked at LLCI's Garden City, New York, office while the plaintiffs were employed there. Defendant Mark I. Lew was the principal shareholder, chairman of the board of directors, and chief executive officer. Compl. at ¶ 20. Defendant Leonard A. Neuhaus was chief financial officer and chief operating officer. *Id.* at ¶ 21. Defendant Brian T. Clendenin was president and head trader. *Id.* at ¶ 22. Defendant Joseph A. Alagna Jr. was executive vice-president and national sales manager. *Id.* at ¶ 23. Defendant Barry S. Rabkin was the first vice-president and sales coordinator. *Id.* at ¶ 24. Defendant Bernard L. Golembe was the operations manager. *Id.* at ¶ 25. Defendants Marc H. Rabkin, Fred Doruskin, and Ronald Doruskin were all junior partner brokers. *Id.* at ¶¶ 26–28.

The complaint alleged a pervasive campaign of sexual harassment and discrimination by the individual defendants and by LLCI against the plaintiffs. The plaintiffs claimed that they were the victims of numerous acts of both physical and verbal harassment, including allegedly serving as the targets for sexually explicit comments and inappropriate contact over the entire period of their employment at LLCI. Moreover, when they complained about their supervisors' behavior and ultimately filed charges with the EEOC, the plaintiffs allege that they were retaliated against, and in the case of Casper, terminated, for making their complaints.

The complaint comprised approximately three hundred paragraphs and eighty pages. Among other things, the complaint sought punitive damages in the amount of ten million dollars ($10,000,000) against each defendant. *Id.* at 81. On May 16, 1997, Chan filed an amended complaint which essentially repeated the claims in the first complaint. Millus Dec. at Exh. B. On May 27, 1997, the EEOC made a reasonable cause finding with respect to the charges. Chan Aff. at Exh. 19. On July 16, 1997, the EEOC filed a separate action of its own against LLCI. *Id.* at ¶ 47.

All defendants filed motions to dismiss, and defendant Clendenin also filed a motion for summary judgment. *Id.* at ¶ 48. By Opinion and Order dated March 31, 1998, District Judge John G. Koeltl denied the motions with respect to the core claims. The case was hotly contested, but the parties engaged in settlement discussions before this Court and before an outside mediator during the first half of 1998. Sometime during this period, however, the relationship between Chan and plaintiffs soured and plaintiffs asked Chan to take no further action on their behalf. In response, Chan asked the Court to be relieved as counsel. *Id.* at ¶ 75. By Order and Opinion dated May 24, 1999, the Court granted the application and ruled that Chan was entitled to a charging lien.

Plaintiffs' newly retained counsel, Paul F. Millus, continued negotiations with defendants and obtained a settlement in the amount of $431,501. Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Reconsideration of the Court's Charging Lien or, in the alternative, to Substantially Reduce the Fees Requested by Lai Lee Chan, Esq. ("Pl. Mem.") at 18. Following notice of settlement, Chan submitted her current request for fees in the amount of $786,862.50. Chan Aff. at ¶ 1. Plaintiffs oppose the fee request as excessive. Pl. Mem. at 1. Plaintiffs also argue that the Court should (1) reconsider its finding that Chan was not dismissed for cause and (2) hold that Chan is entitled to no fee for her work in the case. *Id.*

## II. DISCUSSION

### A. Quantum Meruit

 Under New York law, an attorney dismissed without cause is entitled to payment of reasonable fees and costs incurred prior to the date of substitution of counsel. *Sequa Corp. v. GBJ. Corp.*, 156 F.3d 136, 147 (2d Cir.1998) (*citing* N.Y. Judiciary Law § 475). However, where the client discharges his or her attorney for cause based on the misconduct of the attorney, the attorney has no right to compensation. *Campagnola v. Mulholland, Minion & Roe,* 555 N.E.2d 611, 614, 76 N.Y.2d 38, 44, 556 N.Y.S.2d 239, 242 (1990). In ascertaining the reasonable value of the legal services, courts may consider the following factors: (1) the difficulty of the matter; (2) the nature and extent of the services rendered; (3) the time reasonably expended on those services; (4) the quality of performance by counsel; (5) the qualifications of counsel; (6) the amount at issue; and (7) the results obtained. *Sequa Corp.,* 156 F.3d at 148 (*citing Spano v. Scott,* 166 A.D.2d 917, 561 N.Y.S.2d 678 (N.Y.App.Div.1990); New York Code of Professional Responsibility DR 2–106, 22 N.Y.C.R.R. § 1200.11(b); *520 East 72nd Commercial Corp. v. 520 East 72nd Owners Corp.,* 691 F.Supp. 728, 739 (S.D.N.Y. 1988)). In applying these factors, the Second Circuit in *Sequa Corp,* has upheld the courts' use of the "lodestar approach" of multiplying the attorney's hourly rate by the hours worked to reach a specific dollar figure for the value of the services rendered by the former attorney. 156 F.3d at 148–49.

### B. Motion to Reconsider

 Plaintiffs argue that the Court should reconsider the May 24, 1999 Order granting the charging lien. As an initial matter, plaintiffs have not justified the filing of their motion for reconsideration almost two years after the order in question.

Local Rule 6.3 provides that motions for reconsideration "be served within ten (10) days after the docketing of the Court's determination in the original motion." United States District Courts for the Southern and Eastern Districts of New York, Local Civil Rule 6.3. Plaintiffs seek to avoid this limitation by asserting that "there is a compelling reason for the delay." Pl. Mem. at 19 (*citing Snall v. City of New York,* 2000 WL 1847664, at *3, 242 F.3d 367 (2d Cir. Dec. 15, 2000)). According to plaintiffs, the "compelling reason" in this case is apparently that the existence of cause to terminate did not become clear until Chan submitted her request for fees:

> Based on the facts now known to this Court regarding the relationship between the parties, the malfeasance and nonfeasance on the part of Ms. Chan and Mr. Missan, as well as their questionable billing practices, there should be no doubt that plaintiffs' former counsel should have been discharged for cause.

*Id.* at 20. They allege that Chan's fee application revealed that she (1) "was not competent to handle plaintiffs' case"; (2) "spent excessive amounts of time researching, preparing and reviewing pleadings, motions, and other papers, and preparing plaintiffs for their depositions"; (3) "asserted on plaintiffs' behalf claims that could not be substantiated"; (4) "intended to bill plaintiffs for work done for other clients." *Id.* at 22.

These allegations are meritless. As detailed below, Chan's performance in the case was deficient in significant respects, but plaintiffs have failed to demonstrate that any of these alleged shortcomings provided a basis to terminate Chan for cause. Allegation (1) is undermined by the fact that Chan spent time familiarizing herself with the law, and associated with experienced counsel, including Missan,

who had general litigation experience, and Kenney, who knew the area of employment discrimination. Any claim based on allegation (2) is appropriately considered in reducing her fee, but does not provide cause for termination. With respect to allegation (3), plaintiffs do not make clear what claims asserted by Chan "could not be substantiated." Finally, plaintiffs do not provide any basis for allegation (4) either in the form of documents or testimony, and their claim to know what Chan "intended" is sheer speculation. *Id.* at 22.

Plaintiffs seek to bolster their argument by asserting that Chan's actions violated four separate Disciplinary Rules: 1–102;[4] 2–106;[5] 6–101;[6] 7–102.[7] The deficiencies enumerated by plaintiffs do not appear to match up with these alleged rule violations and plaintiffs do not indicate exactly what behavior of Chan violated which rules. Furthermore, plaintiffs do little more than list the rules. They do not provide the Court with an adequate basis to find that Chan has violated these provisions of the Code of Professional Responsibility.

## C. Calculation of the Appropriate Fee

### 1. The Lodestar Approach

Consistent with *Sequa Corp.*, Chan has framed her request for fees using the lodestar approach. Plaintiffs take issue with both the rate claimed and the hours expended.

### a. Reasonable Hourly Rate

Chan seeks an hourly rate of $350. She does not provide the Court with any basis for this rate. It does not appear to relate to any rate which she has either charged or been awarded by a court. At best, Chan appears to suggest that her rate should be judged by the rate paid to private law firms, which she asserts to be "as much as $600 per hour." Chan Aff. at ¶ 59. Chan cites *Miele v. New York State Teamsters Conference Pension & Retirement Fund,* 831 F.2d 407, 408 (2d Cir. 1987), for the proposition that the Court must award her rates based on the "hourly rates charged to clients of private law firms for similar services." Memorandum of Law of Lai Lee Chan in Opposition to Plaintiffs' Motion for Reconsideration or, in the Alternative, to Reduce Her Fees ("Chan Mem.") at 4.

Plaintiffs argue that a rate of $350 per hour is clearly excessive and that Chan should be awarded rates consistent with those payable to an associate with about three years' experience. Pl. Mem. at 17. They suggest that a reasonable rate in a civil rights case for someone of that experience is $130 to $150 per hour. *Id.* (*citing Marisol A. ex rel. Forbes v. Giuliani,* 111 F.Supp.2d 381, 386–87 (S.D.N.Y.2000)).

While *Miele* and subsequent cases provide for rates based on "similar

---

**4.** A lawyer must not "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Code of Prof. Resp., DR 1–102(A)(4), N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.3 (2002).

**5.** "A lawyer shall not enter into an agreement for, charge or collect an illegal or excessive fee." Code of Prof. Resp., DR 2–106(A), N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.3 (2002).

**6.** "(a) A lawyer shall not ... (1) handle a legal matter which the lawyer knows or should know that he or she is not competent to

handle, without associating with a lawyer who is competent to handle it." Code of Prof. Resp., DR 6–101A1, N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.3 (2002).

**7.** "[A] lawyer shall not ... [k]nowingly advance a claim or defense that is unwarranted under existing law, except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law." Code of Prof. Resp., DR 7–102A2, N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.3 (2002).

services," the benchmark is " 'lawyers of reasonably comparable skill, experience, and reputation.' " 831 F.2d at 409 (*quoting Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). Chan does not address the question of comparability. The Court notes, however, that the bulk of her hours were expended in 1997 (56.7%) and 1998 (38.4%), when she was two to three years admitted to the bar. She had no experience in the area of employment discrimination and did not distinguish herself as the case progressed. Her performance before this Court does not merit any special consideration. Indeed, she was clearly subordinate and deferential to Missan. In sum, she behaved very much like a new recruit. Based on her skill and experience as reflected in this case, the Court finds that a reasonable rate for Chan is $120 per hour. *See, e.g., People ex rel. Vacco v. Rac Holding, Inc.,* 135 F.Supp.2d 359, 363 (N.D.N.Y.2001) (stating that $125 is a reasonable hourly rate for associates with a reasonable amount of experience, and $100 is a reasonable hourly rate for newly admitted attorneys); *Marisol A.,* 111 F.Supp.2d at 386 (awarding $130–$150 for attorneys with one to three years of experience); *Lawson ex rel. Torres v. City of New York,* 2000 WL 1617014, at *4 (S.D.N.Y. Oct. 27, 2000) (awarding $135 after finding that the rate for associates in the Southern District ranges from $105 to $180); *Ward v. New York City Transit Auth.,* 1999 WL 446025, at *10 (S.D.N.Y. June 28, 1999) (awarding $125 for inexperienced litigator in federal court); *Ayres v. 127 Rest. Corp.,* 1999 WL 328348, at *2 (S.D.N.Y. May 21, 1999) (awarding $125 for junior associate in consideration of the "high quality of plaintiff's work"); *TM Park Ave. Associates v. Pataki,* 44 F.Supp.2d 158, 167 (N.D.N.Y. 1999), *vacated on other grounds,* 214 F.3d 344, 349 (2d Cir.2000) (stating that attorneys who have only been practicing for four years should be awarded $100, and

attorneys with a reasonable amount of experience should be awarded $125); *Williams v. New York City Hous. Auth.,* 975 F.Supp. 317, 323 (S.D.N.Y.1997) (awarding $150 for mid-level associates and $135 for junior associates); *Greenway v. Buffalo Hilton Hotel,* 951 F.Supp. 1039, 1070 (W.D.N.Y.1997) (finding that $125 per hour is a reasonable rate for a senior associate with five years of experience); *Helbrans v. Coombe,* 890 F.Supp. 227, 234 (S.D.N.Y.1995) (awarding $125 for junior associates).

### b. Hours Expended

Plaintiffs assert that the hours claimed by Chan should be significantly reduced by the Court. They set forth what they consider to be major problems justifying reduction, including:

(1) Chan's time submissions are not specific enough. "[T]he bulk of the time records submitted by Ms. Chan are objectionable and unreimbursable due to lack of specificity." Pl. Mem. at 3.

(2) The issues in this case were not complex, requiring large expenditures of time. "[T]his was a straightforward hostile work environment sex harassment case to which well-settled law applied." *Id.* at 6.

(3) Chan's skill and experience in this type of litigation were deficient. "[This case] required an understanding of how to deal with multiple opposing counsel to avoid duplication of efforts and the 'teaming up' that multiple counsel will engage in to intimidate their adversary." *Id.* "[Chan] was woefully inexperienced not only in the field of employment discrimination litigation but litigation in general." *Id.* at 15

(4) Chan spent too much time on the tasks she did complete. *Id.* at 7–14.

The Court has reviewed Chan's time records and agrees that she devoted exces-

sive amounts of time to the various activities associated with the case and that her descriptions were lacking in appropriate detail for some items. Moreover, this is not a case in which the Court can point to a few activities and reduce the hours to a reasonable level. Rather, excess seems to have been the rule, not the exception. To support their argument that Chan did not use her time efficiently, plaintiffs included several summaries of the time she spent on various activities. These summaries starkly indicate the extent of the problem.

| TOPIC | HOURS |
|---|---|
| **ACTIVITIES** | |
| EEOC Charges—Plaintiffs | 54.0 |
| EEOC Charges—Others | 48.0 |
| Interviews—Others | 14.5 |
| Original Complaint | 277.5 |
| Amended Complaint | 29.5 |
| Meetings | 167.5 |
| Mediation | 56.0 |
| Drafting Letters | 28.0 |
| Interviews | 14.5 |
| Reviewing Documents | 89.0 |
| Preparation for Deposition and Reviewing Transcripts | 333.0 |
| Review Motions to Dismiss | 64.0 |
| Preparation for Conferences | 51.0 |
| Sur reply, Motion to Dismiss | 134.0 |
| Preparation for Oral Argument | 13.0 |
| **RESEARCH** | |
| Casper Causes of Action | 11.5 |
| Discovery under Title VII and Confidentiality Agreements | 9.5 |
| Personal Liability | 26.5 |
| Emotional Distress | 26.0 |
| Assault and Battery | 14.0 |
| Sealing Information Rule 26(c) | 10.0 |
| January 16, 1998 Order | 19.5 |
| Summary Judgment | 35.0 |
| Continuing Violation Doctrine | 35.0 |
| Slander Per Se | 62.0 |
| Jury Verdicts | 34.5 |
| Tolling and Appeal Rule 54(b) | 70.0 |
| NYC Administrative Code | 36.0 |
| Summary Judgment (Glendinin) | 32.5 |

*Id.* Even these summaries do not paint a full picture of Chan's approach. For example, concerns are raised not simply because Chan spent 277.5 hours drafting the complaint, but because those hours include *each and every day* in February 1997.

On the other hand, this case was not a walkover. As Chan correctly points out, she was opposed by some very large firms with competent and experienced counsel. Defendants filed substantial motions to dismiss, comprising more than two hundred pages, and a joint reply brief of over sixty pages. Following a lengthy oral argument, Judge Koeltl issued a detailed opinion addressing the issues raised in the motions. Plaintiffs' attempt to cast the motions as minor obstacles is refuted by the effort expended by defendants on the motions.

Similarly, discovery was not a simple matter. This Court was called upon to decide some close questions. The defendants were steadfast in their positions. Depositions were extensive. Critical issues were raised concerning the existence of audio tapes in the workforce and alleged verbal comments by plaintiff Cinelli. From the Court's vantage point, Chan had to expend significant time responding to positions taken by defendants.

 The Court finds that Chan should not be compensated for 62.5 hours expended on behalf of persons other than plaintiffs. The Court also finds that, notwithstanding the investment of time necessitated by discovery, the magnitude of Chan's excess, combined with her failure to adequately detail all of her activities, warrant a significant reduction of 50% of her hours. *For reduction for excessive hours, see, e.g., Hensley v. Eckerhart,* 461 U.S. 424, 438, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (stating that District Court properly reduced hours of one attorney by 30% for inexperience and failure to keep contemporaneous time records); *Luciano v. Olsten Corp.,* 109 F.3d 111, 117 (2d Cir. 1997) (affirming disallowance of half of counsel's hours for time unreasonably expended because number of hours reported by attorney was excessive); *Jones v. Kreisel Co.,* 1995 WL 681095, at *3–4 (S.D.N.Y. Nov.16, 1995) (reducing hours from 751.6 to 250 after finding that at least 75% of the hours spent were excessive, redundant or unnecessary); *Anderson v. YARP Rest., Inc.,* 1997 WL 47785, at *5 (S.D.N.Y. Feb. 6, 1997) (reducing overall

requested number of hours by 20% because of excessive hours spent on certain tasks); *Bick v. City of New York*, 1998 WL 190283, at *34 (S.D.N.Y. Apr. 21, 1998) (reducing lodestar by $10,650 from a proposed total fee award of $169,987.50 to reflect excessive and unnecessary work); *TM Park Ave. Associates*, 44 F.Supp.2d at 169 (reducing hours by 10% to account for excessive hours); *Marisol A.*, 111 F.Supp.2d at 396–97, 401 (reducing fees across the board by 15% because of a number of factors such as excessive hours spent on tasks such as learning about the case and preparing proposed findings of fact); *for reduction for inadequate documentation, see, e.g., People ex rel. Vacco*, 135 F.Supp.2d at 364–65 (listing cases in which courts in the Second Circuit have repeatedly reduced fee requests by 10% to 20%); *TM Park Ave. Associates*, 44 F.Supp.2d at 169 (reducing hours by 10% because of insufficient entries); *Local 32B–32J, Service Employees Int'l Union, AFL–CIO v. Port Auth. of New York and New Jersey*, 180 F.R.D. 251, 253 (S.D.N.Y. 1998) (reducing fees by 20% because of lack of specificity for such items as "research" and "meetings"); *Mr. X v. New York State Educ. Dep't*, 20 F.Supp.2d 561, 564 (S.D.N.Y.1998) (reducing fee by 20% because of vague and duplicative time records); *Williams*, 975 F.Supp. at 328 (reducing fee by 10% because of vague and inadequate entries which do not identify the topic discussed or the subject matter); *Wilder v. Bernstein*, 975 F.Supp. 276, 286 (S.D.N.Y.1997) (reducing lodestar calculation by 10% because of cryptic and vague time entries); *Greenway*, 951 F.Supp. at 1069–70 (reducing fee by 10% because time entries did not "always accurately identify the nature or subject of the work performed"); *Walker v. Coughlin*, 909

F.Supp. 872, 881 (W.D.N.Y.1995) (reducing fee by 15% for failure to identify "with precision what the nature or subject was of the work performed"); *Valmonte v. Bane*, 895 F.Supp. 593, 602 (S.D.N.Y.1995) (reducing fee by 20% because of incomplete entries); *Ragin v. Harry Macklowe Real Estate Co.*, 870 F.Supp. 510, 520 (S.D.N.Y. 1994) (reducing fee by 30% for lack of specificity, duplicative claims, and failure to provide contemporaneous records); *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir.1989) (affirming district court's 20% reduction in addition to a 10% reduction that had previously been imposed for vagueness).

### c. Summary

Subtracting 62.5 hours not allocable to plaintiffs and applying a rate of $120 per hour to one-half of the remaining hours claimed by Chan results in a lodestar of $131,655. No further adjustment appears to be warranted based on the evidence presented. The Court therefore finds that under a lodestar approach a fee award of $131,655 represents the reasonable value of the services rendered by Chan pursuant to her charging lien.

### 2. The Contingency Fee Approach

Although the lodestar approach has been approved by the Second Circuit in *Miele* and Chan presented her request in those terms, ultimately the question which the Court must answer is what was the value of the services rendered by Chan. One of the assertions made by Chan is that she and Missan had received an offer of $750,000 from defendants and that plaintiffs had refused to accept the offer. If this were true, it could be argued that the value of their services was $250,000,[8] or

---

**8.** Presumably, this amount would be divided between Chan and Missan. No evidence has been presented on how such a division would take place. Moreover, the Court did not ask the adversaries to discuss or brief what would be Chan's rights to all, or any part, of such an award.

one third of the settlement amount. In addition, the magnitude of any offer would be some evidence of the "quality of performance" by Chan as well as the "results obtained" as detailed in *Sequa Corp.* Because the plaintiffs and Chan presented conflicting information concerning this alleged offer from defendants, the Court held a hearing at which they were allowed to present evidence on this issue and shed further light on the circumstances surrounding the breakdown of the attorney-client relationship.

### a. Chan's Position

According to Chan, after two days of mediation in April 1998, the mediator recommended a settlement of $1,200,000. Chan Aff. at ¶ 56. While defendants did not agree to this amount, they made a counter offer of $750,000, or $250,000 for each plaintiff. *Id.* Chan testified that she and Missan had spoken to each of the plaintiffs and conveyed this offer to them, and that each plaintiff in turn had rejected the offer. Hearing on October 23, 2001. In support of her testimony, she submitted an affidavit from Missan indicating that a $750,000 offer had been made by the defendants and that it had been rejected by plaintiffs.

### b. Plaintiffs' position

Each of the plaintiffs testified that she was not informed of a $750,000 offer by either Missan or Chan, and that she would have accepted her share of the $750,000 if it had been offered. *Id.* Each plaintiff also generally complained of a failure of communication with Chan and Missan. *Id.*

### c. Discussion.

■ The first question for the Court is what burdens shall apply to its consider-

ations. Because counsel owes a duty to the client and is in the best position to assess and document settlement proposals, the Court concludes that it is counsel's burden to demonstrate (1) the existence of an offer, (2) that the offer was accurately and adequately conveyed to the client, and (3) the client's response was accurately ascertained. Moreover, counsel must demonstrate that nothing she has said or done had the intent or effect of unduly affecting the client's understanding of, or response to, the offer.

■ With the exception of Chan's testimony and the statement from Missan, there is no evidence in the record that there was ever an offer from the defendants in the amount of $750,000. There is no time record entry indicating a discussion with defendants about an offer. There is no time record indicating a discussion with co-counsel Kenney (the "employment" counsel) concerning a settlement offer.[9] There is no letter from Chan or Missan to plaintiffs referencing the offer nor indicating a rejection of the offer by any of the plaintiffs. There is no reference to such an offer in any correspondence about subsequent lower offers to plaintiffs.

The absence of documentation must be evaluated in the context of counsel's incentive to "make a record." Here, Chan knew that the case had problems from a litigation standpoint.

- Casper wanted to separate her case from the other plaintiffs, particularly because of questions related to Cinelli's behavior.
- Caliendo had expressed reservations about continuing the litigation and wanted to drop the case.

9. The day after the mediation, Chan's time record includes the following entry: "Meeting with RSM, LBK and TPP re mediation (2.0); telephone calls with Casper, Caliendo & Cinelli re mediation (2.5)." Chan Aff. at Exh. 5, pg. 41.

- Cinelli had serious issues concerning her behavior in the workforce and long-running deposition by defendants.

Chan also knew that there would be problems achieving settlement at the monetary level sought by plaintiffs.

- The defendants had financial problems, which restricted the amount that could be obtained in any settlement.
- Although plaintiffs had indicated they wanted $4,500,000, the highest amount previously mentioned was the $1,200,000 recommended by the mediator.
- Settlements in similar cases, including one with the same employer, had resulted in payments of less than $200,000 per claimant.

Given these considerations, Chan had a strong incentive to memorialize her position that she thought $750,000 was a good offer and that she had recommended it to plaintiffs. The Court finds that it is not credible that counsel would have received what she considered a reasonable settlement offer from defendants, recommended that the offer be accepted by plaintiffs, been rebuffed by plaintiffs, and failed to document this situation.[10] Because the testimony of plaintiffs was credible and consistent, the Court finds that Chan either did not receive an offer from defendants or failed to convey such an offer to plaintiffs.

### d. Counsel's Impact on Settlement Possibility

■ Even if the Court were to conclude, however, that a bona fide offer of $750,000 was conveyed to, and rejected by, plaintiffs, Chan would still not be entitled to benefit from the existence of the offer. The Court finds that the atmosphere created by Chan and Missan made it highly unlikely that plaintiffs would make an informed decision on the offer.

To be sure, Chan was inexperienced. Her major failing, however, was not in the litigation per se. The excessive research, the many hours getting up to speed, the unfamiliarity with the case law, were but symptoms of a far greater problem: Chan did not know how to close the case. This was a case which cried out for settlement from the beginning. In her affidavit, Chan explicitly alluded to statements by defendants which should have alerted her to this strategy.[11] Chan's failing was in not being able to implement this approach. An experienced attorney would not have tied the fates of the three plaintiffs together. An experienced attorney would not have expended so much time that it became an impediment to settling the case. An experienced attorney would not have allowed the plaintiffs to believe that this was a multi-million dollar case. An experienced attorney would not have drafted a complaint which was overly detailed and inconsistent with Rule 8(a), Federal Rules of Civil Procedure. An experienced attorney would not have cooperated in the playing out of this case in the media.

Even now, Chan does not appear to appreciate the straitjacket created by her litigation approach. In her memorandum

10. Chan and Missan apparently did recognize the importance of documenting other settlement issues, including a subsequent offer of $240,000 to Casper individually; Chan Aff. at Exh. 8; and problems with the Caliendo settlement. *Id.* at Exh. 10.

11. Indeed, on July 17, 1997 (less than three months after the commencement of the lawsuit), *The New York Times* quoted Mark I. Lew (Chairman and Chief Executive Officer of Lew Lieberbaum) as stating, "We can't afford to fight this kind of litigation forever," Mr. Lew said that he "hoped a settlement could be reached," that "Lew Lieberbaum's yearly revenues had fallen significantly from $30 million a year ago, partly because of the publicity surrounding the harassment charges." *Id.* at ¶ 28 n. 8.

of law, she spends considerable time talking about the significance of the case even though it should be clear to her now that this is not an extraordinary case from a legal point of view. The salaciousness of the details could not transform this case into the seminal vehicle for the litigation of sexual harassment claims. Because Chan did not fully appreciate the limitations of this case as broad precedent, she made a number of errors which made settlement an unlikely result.

### i. Mistake Number One—The Pact

Although aware of potential conflicts among the plaintiffs, and without the benefit of any discovery which could reveal the weaknesses or strengths of each plaintiff's claim, Chan and Missan not only agreed to joint representation, but to an equal sharing of any proceeds:

> This letter will confirm that the undersigned agree that any and all recovery in connection with our claims against Lew Lieberbaum & Co., Inc. and the other defendants shall be shared *equally* by the three of us, after deduction of your firm's legal fees.

Chan Aff. at Exh. 6. It is indeed possible that this single decision sealed the fate of this case with regard to Chan's negotiating and finalizing a reasonable settlement. By tying the claims of the plaintiffs together, the "good" claims were inexorably affected by the "bad" claims. The situation was

exacerbated because Chan became too personally involved to be objective:

> "They trusted me enough to share extremely personal information with me about their lives, their family, and home life." *Id.* at ¶ 19.
>
> "After the filing of the lawsuit (until about June 1998), not a day passed by in which I did not speak to at least one of them at least once a day." *Id.*
>
> "The plaintiffs asked me to form a 'pact' with them about the lawsuit—that we would sink or swim together." *Id.* at ¶ 20
>
> "I did not feel that anyone could give the case the kind of love and attention which I gave to the case. It was my creation." *Id.* at ¶ 24 n. 31 (emphasis in original).

If not at the beginning, then certainly when conflicts began to surface, Chan should have realized that her joint representation ran afoul of the Code of Professional Responsibility. Code of Prof. Resp., DR 5–105(A), N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.3 (2002) ("A lawyer should exercise independent professional judgment on behalf of a client").[12] Once the defendants raised issues affecting the strengths of each plaintiff's claim, it was inappropriate to represent the three plaintiffs pursuant to this pact.[13]

### ii. Mistake Number Two—An inflated View of the Value of the Case

From the beginning of this litigation, Chan thought that this case was a multimillion dollar event.[14] In her first submis-

---

12. ABA Model Code Prof. Resp. EC 5–14 ("Maintaining the independence of professional judgment required of a lawyer precludes ... acceptance or continuation of employment that will adversely affect [the lawyer's] judgment on behalf of or dilute [the lawyer's] loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant.").

13. ABA Model Code Prof. Resp. EC 5–15 ("If ... the interests did become actually differing, the lawyer would have to withdraw from employment ...").

14. "'This case is unprecedented because what is said to have happened to these women was so severe, so egregious,' says Lai Lee Chan, the women's attorney. That's why, Chan maintains, she and her co-counsels, Richard Missan and Thomas Puccio, are demanding a minimum of $100 million in punitive damages in addition to unspecified com-

sion to this Court on the issue of settlement, Chan requested amounts which were so far out of bounds that the Court had to admonish her for her proposals. The plaintiffs testified that Chan indicated that the case would be a "seven figure" recovery. Chan's belief in the value of the case led her and Missan to put an enormous amount of time and energy into the litigation, virtually insuring that settlement would be difficult. At the time of the alleged settlement proposal of $750,000, Chan and Missan had accrued fees of about $1,000,000. It is not surprising that plaintiffs believed they had a big ticket case. Rather than giving plaintiffs a realistic evaluation of the case when they asked whether they could get a global settlement of $4,500,000, Chan's reply that "anything could happen at trial" ill-served her clients. *Id.* at ¶ 28.

The Court concludes that Chan never gave plaintiffs a basis for any realistic expectations for settlement. In addition, she provided the Court with no credible basis for recovery of the magnitude conveyed to plaintiffs. For example, the EEOC had recently settled its separate case against LLCI for $1.75 million (including $1.55 million for seventeen individual charging parties). *Id.* at Exh. 12; *Newsday,* April 9, 1998. The EEOC had also recently settled another harassment case against a different brokerage firm for $750,000 (six charging parties). *Id.; Daily News,* May 7, 1997. The Court does not mean to suggest that the plaintiffs' cases were not worth more than these cases or that recovery by the EEOC should serve as some limitation on plaintiffs' claims.[15]

pensatory damages." Chan Aff. at Exh. 14; *The Times Magazine,* July 12, 1997.

15. The EEOC, for example, might be more concerned with injunctive relief while the plaintiffs, as former employees, would put a lower value on such considerations.

Rather, these cases should have formed part of the calculus in evaluating the range of recoveries that were possible or likely against LLCI.

### iii. Mistake Number Three—An Inflated View of the Impact of the Case

Based on her affidavit, Chan still believes that this case has a social and legal significance beyond its evident worth.

"The Complaint sparked discussion and discourse among legal experts ..." *Id.* at ¶ 43.

"The Complaint forced debate on the question of how to draw the map of culpability." *Id.* at ¶ 44.

"The Complaint also forced debate on the question[ ] of whether mandatory arbitration is appropriate in employment discrimination cases, ..." *Id.* at ¶ 45.

"The Complaint raised public consciousness that such conduct may also be committed to buy and condoned by white-collar corporate America, captains of industries." *Id.* at ¶ 46.

"The Complaint needed to be carefully researched and investigated. As set forth above, the Complaint sought to establish legal precedent in the area of civil rights and employment discrimination. Novel and unsettled issues needed to be carefully researched. In addition, the Complaint contained highly explosive charges which needed to be well investigated." *Id.* at ¶ 62.

It is clear that this attitude was conveyed to, and became part of, the thinking of the plaintiffs.[16]

16. Plaintiff Cinelli said, "What I am doing for my generation I hope will help future generations of American working women. There is no dollar amount I can place on the pain I endured.... I will pursue my claims to the ends of the earth until I received justice .... they took the best out of me." *Id.* at Exh. 12; *New York Daily News,* April 9, 1998.

#### iv. Mistake Number Four—Making the Case a Media Nightmare

Perhaps the most telling aspect of Chan's representation was her believe in the media value of the case. As Chan put it:

> "The *Lew Lieberbaum* case made front-page news. It was front-page news for two consecutive days in New York. Newspapers such as *The New York Times, The Wall Street Journal, The New York Law Journal, The Daily News, The New York Post,* and *Newsday* reported the case .... The case was also broadcasted via radio and television, e.g., CBS, NBC, Fox, ABC. Television crews staked out the front entrance of Lew Lieberbaum." *Id.* at ¶ 39.

> "As demonstrated by these newspaper articles, the press invariably quoted directly from the Complaint. As demonstrated by these newspaper articles, the Complaint served as their primary source of information about the case." *Id.* at ¶ 41.

> "One journalist wrote that the complaint 'read like a Michael Crichton novel with additional reporting supplied by *Penthouse.*'" *Id.* ¶ 42.

The case was filed on April 28, 1997. Chan and Missan had the plaintiffs conducting press conferences immediately. LLCI, the individual defendants, and, more importantly, the plaintiffs had to contend with the media blitz. This created an atmosphere in which the case took on a life far disproportionate to its legal worth. For this, Chan and Missan must bear the responsibility.

### III. CONCLUSION

Whether the Court considers a lodestar approach or looks at the contingency fee arrangement between Chan and plaintiffs, her request for more than $750,000 greatly overstates the quantum meruit value of her services to plaintiffs. She, however, did significant work during the discovery phase, including defending the various motions to dismiss. As detailed above, the Court finds that a reasonable lodestar value for that work is $131,655.